Marie YOUNT, Plaintiff-Appellant,

v.

The POSITIVE SAFETY MANUFACTURING COMPANY, Defendant-Appellee.

Hershel F. YOUNT, Plaintiff-Appellant,

v.

The POSITIVE SAFETY MANUFACTURING COMPANY, Defendant-Appellee.

Nos. 14780, 14781.

United States Court of Appeals
Sixth Circuit.

June 10, 1963.

Harley J. McNeal, Cleveland, Ohio, for appellants.

Thomas A. Dugan and Michael R. Gallagher, Cleveland, Ohio (Hauxhurst, Sharp, Cull & Kellogg, Cleveland, Ohio, on the brief), for appellee.

Before O'SULLIVAN, Circuit Judge, McALLISTER, Senior Circuit Judge, and BOYD, District Judge.

McALLISTER, Senior Circuit Judge.

Marie Yount was a press operator who suffered injuries while in the employment of the Central States Paper & Bag Company, Inc. She brought suit, not against her employer, but against The Positive Safety Manufacturing Company, which had sold to her employer a safety device used in connection with the operation of a metal press for creasing and cutting paper; and she claimed negligence on the part of the defendant company in the manufacture, delivery, distribution, sale, and inspection of the device which, she alleged, was improperly designed, and which was unsafe for the purpose for which it was to be used; she alleged that the defendant company had impliedly and expressly warranted that the device would prevent and eliminate injuries such as she sustained as a result of the crushing and mangling of her left hand and forearm, which it was necessary to amputate, and that her injuries resulted from the above mentioned negligence of the appellee company, and, in a separate cause of action, she submitted that her reliance upon the implied and expressed warranties, resulting in her belief that the safety device would insure her from danger, caused her to sustain the damages which she suffered.

Appellant Hershel F. Yount is the husband of Marie Yount and also sued the same defendant for damages arising out of loss of services of his wife and of consortium.

On the trial, a jury returned a verdict of no cause of action. A motion for a new trial was denied; and appellants seek review, claiming error on the part of the trial court in rulings upon law; in refusing to admit evidence; and in the admission of testimony which, it is alleged, resulted in prejudicial, reversible error.

The facts of the case are as follows: The Central States Paper & Bag Co., Inc. had a "Seybold" press primarily for use in cutting large-sized pieces of cardboard. It could be operated with either two or four workers. One, or two, stood at one side of the press feeding cardboard material and activating the press. One, or two "take out" workers stood at the other side of the

press removing the cut cardboard. The fixed lower platen or bed of the press was 54½ inches from the ground. The movable upper platen was fitted with cutting dies. The cutting operation was performed by the drop of the upper platen onto the lower platen. The upper platen traveled only 3½ inches from the open to the closed position. All of the workers engaged in the press work were obliged to reach into the opening between the platens at the conclusion of each cycle of the operation.

The operation of the press was obviously a dangerous one for employees who were obliged to reach into the opening between the two platens in the interval when they were apart, and to withdraw the cardboard which had been cut by the dies, before the upper platen came down again upon the lower one. The way in which the press operated was described by Clement Sidhoff, the machine shop foreman of the Paper Company: The employee who is the operator of the press—or, often, the "set up man"—places the cardboard between the platens. The operator then pulls a clutch and the upper platen comes down onto the lower platen. The "take out" helper stands on the side of the press opposite the operator, and when the upper platen is raised on the up stroke, the "take out" helper reaches into the opening between the platens and pulls the cardboard out. The press is always under the control of the operator. When he pulls the clutch, the press operates with a down stroke and then an up stroke. When the clutch is out, the press operates continuously. When the operator puts the clutch in, the brake goes on, and the press stops moving.

The operator of the press determines whether the helper's hands are out of the opening between the platens, by looking through the space between the platens when they are separated. From the testimony of the foreman, "the length of time it would take the platen * * * of the press to do its job, that is, the cycle * * * is pretty fast." Supervisor Leroy Keck testified: "We were aware that it was a dangerous operation and we had been trying to find something to make it a little more safe. * * *" It was necessary to have a safety device on the press. "I don't know how we got by all [those] seven years without one," foreman Sidhoff said.

During the seven-year period mentioned by foreman Sidhoff, the Paper Company considered many safety devices. As Mr. Keck said, with regard to the decision to put some kind of a safety device on the press, "that machine was a horrible looking thing with people going by there—I mean, not with people going by, with anybody going by seeing somebody put their hand in there, and that fly wheel going along, and any time, anything might happen, and we were aware we needed a safety device, but what. So we talked to everybody and tried to find some kind of a safety device." The company, as Mr. Keck said, had come up with a system of steel blocks—that "when the press come up there would be little blocks on the corner that would drop down and hold it up. But after thinking that over, that wasn't too good, either." As above seen, the press presented problems and, as Mr. Keck remarked, everybody in the company and in the plant was seeking some favorable solution to this hazardous operation.

Eventually the Safety Committee of the Paper Company called upon representatives of Safety, Inc. to suggest possible safety devices which might reduce the hazard of the press. Safety, Inc. was a corporation which handled all types of safety equipment, and, after a conference, it suggested that the Paper Company purchase four Posson's safety harnesses which were manufactured by appellee, The Positive Safety Manufacturing Company. In its suggestions, Safety, Inc. acted either as an independent contractor or as the Paper Company's agent, but not as the agent of The Positive Safety Manufacturing Company. The Paper Company's Safety

Committee, after its independent investigation, recommended to the Paper Company that the safety device manufactured by appellee company be purchased; and the Paper Company agreed to the purchase on the specific condition that it have the right to return the harnesses if they proved unsatisfactory. The representatives of Safety, Inc. then took certain measurements of the press, in St. Louis, Missouri, and forwarded this information to The Positive Safety Manufacturing Company in Cleveland, Ohio. The Paper Company thereupon entered into a conditional purchase, the condition being that the Paper Company determine through experimentation and operational use whether the device afforded protection; and, if it did not meet with the satisfaction of the Paper Company, it was to be returned.

The Paper Company subsequently received the device which was shipped to it by The Positive Safety Manufacturing Company, and had its own employees install the device. It afterward decided to keep the device, and used the safety device with the press continuously for about two years until the accident to appellant. The Positive Manufacturing Company never saw the press until two years after the installation by the Paper Company's employees, when a representative of the appellee company came to see the installation, and to ascertain how the accident came about.

The safety device and its operation may be described as follows: A vertical post or column is attached to the ceiling above and away from the press, approximately over the location where the "take away" helper stands. The column may be thought of as a hollow column with one cable coming out of the top of it. Somewhere inside the hollow column an end of this cable is attached to two cables that come out of the bottom of the hollow column. If the cable, coming from the top of the column, is pulled upon, it pulls upward on the two cables to which it is attached inside the column. In this case, one end of the cable coming out of the top of the hollow column is fastened to the top platen of the press. When the top platen of the press descends, it pulls part of the cable out of the top of the column. When this top cable is pulled by the descending platen, it, in turn, pulls upward the ends of the two lower cables to which it is attached. These two cables, which protrude from the bottom of the column, have fastened to their ends two wristlets, which are fitted around a workman's wrist. The cables, to which the wristlets are fastened, can be arranged, according to the length of the cables and location of pulleys, so that when they are pulled, the wristlets will be pulled either toward the press or away from the press. In this case, the cables or cords protruding from the bottom of the column were arranged so that when they were pulled, they would pull the wristlets away from the press. In the safety device there was used a multiplier, which multiplies the pulling action so that by the time the upper platen has traveled a distance of 3½ inches, the employee's wrists, to which the wristlets are attached, have been pulled back many times more than that distance.

The foregoing is not a description of the safety device, accurate in all details, but illustrates generally its operation. Included in the device are also ceiling rods and rod supports which formed a part of the whole device.

In order to accomplish its objective of safety, it is evident that such a device must be installed, attached to the press, and to the ceiling above the press, and also have cables or cords of a certain length with wristlets attached to the hands of the employees, so that when the press is in operation, the hands of the employees will be automatically pulled out of the space between the two platens before the upper platen drops upon the lower platen. It is also evident that, before the installation, it should be known how far in between the platens the employee is obliged to reach; and

how far the pull-back of the wristlets is to be.

Safety, Inc., which had been consulted by the Paper Company, wrote appellee company that "on some work the operator has to reach about 6 inches in the press about 12 inches off center."

In order to determine the point of greatest penetration of an employee's hand and arm between the platens, it is necessary to calculate the arc through which the employee's arm moves; thus, a line is ascertained from the cord outlet to the farthest point that the employee is *required* to reach. In this case, as has been said, that point is 6 inches at a point 12 inches off center. By moving the above-mentioned line toward the left or right, the *possible* penetration of the hand and arm at every point along the arc can be determined. Using the maximum point of penetration of the employee's hands, as given by Safety, Inc. to appellee company, at a point "6 inches in the press about 12 inches off center," Mr. Karl Fobes, of The Positive Safety Manufacturing Company, ascertained, from the data submitted by Safety, Inc., that the maximum possible penetration of the left arm of the employee using the device, used by Mrs. Yount, at a point near the left side of the press, would be 12¼ inches. Mr. Fobes, from the above-mentioned data, concluded that, with a maximum required entry of 6 inches at a point 12 inches off center, the safety device could remove the take-out employee's left hand from this point, and also from the point of maximum possible entry—12 inches on the left side of the press—to a point of safety outside the press, provided the device was kept in adjustment. In fact, although appellee company's literature on the subject specified that such a point of safety would be 2 or 3 inches from the press, Mr. Fobes found that an additional factor of safety of 3 inches could be added to the pull-back. This would make a pull-back of 12 inch-es, equal to the maximum possible entry of the employee's arm, plus 6 inches from the edge of the press, or a total pull-back of 18 inches. In other words, the safety device would protect an employee reaching into the press a maximum required penetration of 6 inches at center, and a maximum possible penetration of 12 inches at the side of the press.

Mr. Fobes, in telling how he arrived at the above figures from the data supplied by Safety, Inc., testified:

"That means that if the operator were going to reach into the center line of the press 6 inches, as outlined in the sketch sent with the order, that the travel of the cords at the far end—far edge of the press, that is straight out from the cord outlet, the travel of the cord would have to be approximately 18 inches long to put the hand in a safe position. * * * I laid this out on the floor, I figured the arc from 6 inches in at the center line, and I brought it around and measured what the arc would be in at the edge of the press."

In answer to a question regarding the safety of the device, he testified:

"Q. Is it or is it not the fact that this device as you fabricated it would provide safety for the operator within the specifications as used—as provided in the letters and diagrams submitted to you? * * *

"A. The answer is yes."

When the safety device was shipped by The Positive Safety Manufacturing Company to the Paper Company, it was accompanied by several copies of the "Foreman's, Die Setter's and Operator's Manual," as well as instructions for the installation of the device. However, the employees of the Paper Company made several changes in the recommended installation. The instruction sheet which appellee company furnished the Paper Company stated the follow-

ing, with regard to initial testing and periodic testing of the device:

"The Posson's Positive Punch Press Safety Device is being placed in your plant with the understanding that its use will be under strict supervision. *It is, therefore, necessary that foreman, job setters and others in charge of punch press operations thoroughly understand it.* * * *

"After the safety device is securely fastened to the frame and the ram connection is made, then have the operator place the wrist bands on his hands and snap up the pull-back cords. The hands should then be placed at the right and left side of the die and the press then turned slowly by hand until ½" of clearance is open between the upper and lower die. The fingers should then be from 2 to 3" in the clear in front of the die. In order to get this location, the cable on the storage sheave should be wound up or let out as required, using the small handle that is located in front of the sheave cam. * *

"When jobs or operators are changed, check the adjustments and make sure that the operator's hands are drawn free from danger." (Emphasis supplied.)

The "Foreman's, Die Setter's and Operator's Manual" contained the following language regarding proper adjustment of the safety device:

"Finger tip clearance will be checked by turning the press over by hand. This must be done with the work in the die so that safe clearance is assured between the top of the work and the upper die. See illustration on pages 6, 7, and 8. When the upper and lower dies are held at the pinch point, there should be *2 inches of clearance when the fingers are extended outward toward the die,* preferably 3 inches." (Emphasis as in the manual.)

On the pages immediately following the quoted language, there were five pictures showing proper and improper adjustment. The manual also contained the following caution regarding inspection:

"Daily.

"*Finger tip clearance* and visual check of wrist band and cords. This includes inspection when operators are changed or new job set-up is started, also when shift change of operators is made." (Emphasis supplied.)

The foregoing told how the cords and cables should be adjusted by the user to secure safety and protection for the worker.

The safety device had been in use for two years before the accident. Marie Yount had been working on the press for approximately one year. Adjustments, inspections, and maintenance of the device had been carried on from time to time during the entire two-year period by employees of the Paper Company. The Safety Committee of the Paper company was continuously concerned with the adjustments. Some three months after the original installation and adjustment, the minutes of the Safety Committee stated:

"The minutes of the February meeting stand approved as corrected, the correction: 'The Posson's safety device in the Press Room needs additional adjustments, which have not been made, so that the many varied jobs can be run more effectively'."

The accident, therefore, must have occurred either because of making an unsafe adjustment of the device by the Paper Company, or a failure to correct a faulty adjustment.

We shall first consider appellant's contentions with regard to appellee's breach of express and implied warranties. The District Court held that appellant had not established either an express warranty or an implied warranty.

The appellants claim that the following statements communicated in the catalogue and printed instructions sent by appellee company to the Paper Company, with the safety device, constitute express warranties:

1. "To Insure ABSOLUTE SAFETY in your PRESS DEPARTMENT Use POSSONS POSITIVE PUNCH PRESS SAFETY DEVICES."

2. "The POSSONS POSITIVE PUNCH PRESS SAFETY DEVICE provides safety because the press operator's hands are removed from the danger zone by a POSITIVE action. * * "

3. "Steel cored cables pull his hands away and his own carelessness cannot cause an accident."

4. "The attachment to the ram of the press below any possible breaking point insures the pull-back of the ropes. * * * "

5. "The Possons Device will continue to function perfectly if, from any cause, the press repeats."

6. *"The adjustable features permit the location of the pull-back in conformity with the dies. * ** There is no jerk or pull on his hands unless he is in actual danger."

7. "The location of the standard of the Safety Device can be at any distance from the bolster plate, thus enabling the operator to reach to the right or left to any distance required." (Emphasis supplied.)

Appellant, Marie Yount, had never had any contact with appellee company's employees, nor did she ever read the appellee's manual or instructions or advertising material. She purchased nothing from appellee company. She did not rely on any express warranty and her continued employment was not contingent on such a warranty. She was warned by the foreman that the safety device was not perfect, and that there were dangers connected with its use. The only way that appellant seems to rely upon express warranties is on the ground that appellee company made such express warranties to the Paper Company, and that such warranties inure to her benefit. This is an Ohio case, and, as to express warranty, reliance thereon is specifically required by Ohio Revised Code, Section 1315.13 of the Uniform Sales Law, which provides that an express warranty arises only "if the buyer purchases the goods relying thereon. * * * "

With regard to an implied warranty of reasonable fitness, reliance is required by Ohio Revised Code, Section 1315.16 of the Uniform Sales Law, which provides that an implied warranty arises only when "it appears that the buyer relies on the seller's skill or judgment."

All of the evidence discloses that the Paper Company bought the safety device on the specific condition that it would have the right to return it if it proved unsatisfactory. It was understood that the Paper Company would determine, through experimentation, adjustment, and use, whether the device afforded protection. The Safety Committee of the Paper Company was continuously concerned with such adjustments. The Paper Company itself installed the device. It made changes in its structure without consulting or relying upon appellee company. It continuously made adjustments and relied on its own judgment in making them. Safety and peril, as far as appears from this record, depended upon the adjustment of the cords and cables attached to the worker's wrists, and appellee company never knew how or when such adjustments were made. Tests were made by the Paper Company, regularly, for proper adjustment during the entire two-year period in which the device was used.

These tests were separately made for each girl who was a "pull-out" worker. Mr. Keck, the Supervisor, testified:

"After a while I got so that these girls are different heights and dif-

ferent reaches, and one thing and another, and whoever I thought was going to run the machine I had myself a little set of figures and from the bell cord to the buckle, I used to keep a little set of figures about how far that cord was. And a lot of times in the morning before these people were at work I would be in there and I figure well, I am going to use this girl on here today, and I would check my length. And if I had any adjusting to do, why, I would adjust it. And when the girl come in, before we start to work, I put her in the harness and try it. Well, that way I probably only have a half a turn, more or less, to take up or to leave out. And generally after I had this inspection, I would release her and raise the press and then we would always make an impression or two to see whether or not she could extend into the press to get her material out."

With regard to appellant, Mr. Keck testified:

"Q. Now prior to the beginning of the operation involving Marie Yount, what if anything did you do in connection with the checking and adjusting of the wrist bands and the cord?

"A. Well, I had her in the harness and checked her for her nip point. Not on that particular day, but the day ahead of that. I had her in the harness there to see whether or not she was in a safe distance from the press.

"Q. On the day or the morning that the accident occurred, did you make any checks of the device?

"A. No. No."

As to the tests made by appellant before the accident, Mr. Keck testified:

"Now as far as Marie Yount was concerned, when we started this job I happened to be there and I said, 'Well, let's try it, kid. Let's put your harness on and see how far it goes.' So we got her harness on, we put the press down and Marie stretched out and she couldn't catch—she was about 3 inches away from the machine."

One of these tests was made two days before the accident. But it was not made in the manner prescribed by appellee company, with the press open, but rather with the press closed. No tests were made on the day of the accident or the day before, although the manual accompanying the safety device called for daily tests of fingertip clearance and visual check of wristbands and cords. Mr. Keck, the Supervisor of the Paper Company, stated that he had at all times on his desk the "Foreman's, Die Setter's and Operator's Manual" and instructed Mrs. Yount to read it. However, she did not do so, and, consequently, did not know how to perform a proper test, for her own safety.

As far as the Paper Company was concerned, it purchased or made safety devices for many of its presses and cutters. The minutes of the Safety Committee of the Paper Company disclosed that the members of the Committee were thoroughly familiar with safety devices of the positive action type, and that the Committee made extensive investigations, both outside and inside its plant, prior to purchasing the safety device in the instant case. When the Paper Company installed the safety device, it performed tests to determine whether it was working properly, and periodic tests were performed by the Safety Committee thereafter. The Paper Company even undertook to make changes in the construction of the device without consulting appellee company. It substituted thinner and less rigid rods, raised the cable outlets, and switched the wrist straps. Obviously, in this, it was relying on its own superior knowledge in purchasing, using, testing, and experimenting with the safety device, and did not purchase it in reliance on any warranty which had been contained in the advertising ma-

terial of the appellee company, nor upon any implied warranties. Appellant submits that the safety device was delivered to the Paper Company and furnished with sufficient cord which permitted the Paper Company to adjust the reach-in so that the worker could reach into the press a maximum of 21 inches at the side of the press. This has no bearing upon the issue we are considering. The Paper Company could adjust the length of the cord in any way it desired. The entire adjustment of the cords was understood to be within the control of the Paper Company inasmuch as it took upon itself the installation, inspection, experimentation, and use of the device as a condition of its purchase, and had the specific right to return the device in case it proved to be unsatisfactory after its experimentation and operational use which it undertook in order to satisfy itself that the device afforded the protection it desired. Appellant Marie Yount herself knew that tests were required to be made frequently, and were so made, to test for clearance of her hands and arms, in order to insure her safety during the operation of the press. No express warranties were made to appellant Yount, either directly or indirectly, nor did she have knowledge of any alleged express warranties, either directly or indirectly. As to implied warranty, she is not in privity with the appellee, and would be barred under the authority of Wood v. General Electric Co., 159 Ohio St. 273, 112 N.E.2d 8.

We are unable to find in the record any evidence that would justify the District Court in submitting to the jury the question of appellee's breach of express or implied covenants, resulting in the injuries to appellant, Marie Yount; and we are of the view that the District Court properly held that appellant did not establish a cause of action against appellee company, in warranty, either express or implied.

Appellant submits it was reversible error for the trial court to submit to the jury the question of her contributory negligence. The Court charged the jury as follows:

"The Plaintiff was required to exercise her senses and intelligence to discover and avoid danger. In this connection, however, you should consider that Plaintiff was subjected to the 'nip point' test before she commenced working on the particular job she was doing at the time of her injury. You should consider, also, her reliance upon the safety device to protect her from injury. If you find by the greater weight of the evidence that the Plaintiff was guilty of contributory negligence, she cannot recover."

It is appellant's contention that no charge whatsoever should have been given on the subject of contributory negligence. Appellant argues that there can be no contributory negligence when a manufacturer has failed to warn of a product's danger. However, appellee company did give instructions regarding the use and inspection of the safety device. Many of these were entirely disregarded by the Paper Company and appellant. As stated before, the Paper Company experimented with the safety device and made adjustments, so that a worker's hands and arms would be protected. It had complete knowledge of the working of the device. As heretofore said, it installed it, and made all safety adjustments without communicating with appellee company in any way. It is difficult to see how appellee company would be liable for failure to warn the Paper Company of something of which the Paper Company had complete knowledge, and after the Paper Company had taken upon itself the responsibility of making all safety adjustments, without any further consultations with appellee company, all of which was known to appellee.

Appellant had been advised by her employer that she could not place complete reliance on the device. The Supervisor of the Paper Company, Mr Keck, had specifically directed her to read the "Operator's Responsibility Manual." If she

had read the manual, she would have seen how the fingertip test should have been performed, and would have known that it should have been made daily. The instructions received by the Paper Company from appellee specified where the wristbands were to be attached, and the letters "L" and "R" were clearly imprinted on the wristbands and were for the left and right hand, respectively; however, the wristbands were switched in disregard of the instruction as to their proper attachment. It was not prejudicial error for the trial court to state to the jury that appellant was required to exercise her senses and intelligence to discover and avoid danger.

In denying a motion for a new trial based on the ground that it was error to submit to the jury the question of appellant's contributory negligence, the Court dealt with this subject comprehensively, saying:

"When plaintiff was assigned to her job as 'take off' operator she was informed by her immediate superior, Mr. Keck, that there were dangers involved in the use of the safety device and that it was not a perfect instrument. Plaintiff knew therefore that it was incumbent upon her to exercise ordinary care for her own safety while at work. She worked on the Seybold press for almost a year. Two days before the accident she commenced the particular job which she was working on at the time she was injured. Keck testified that each morning he adjusted the safety device while the 'take off' operator's hands and arms were attached thereto. He said he would 'run the machine a few times to check it.' The last time such a test was made by Keck was on the Thursday preceding the accident, which occurred on Saturday. Keck was ill on Friday and Saturday. There was testimony showing that there was no change in the adjustment of the safety device from the time of the accident until Mr. Brick, plaintiff's expert, and Mr. Fobes of the defendant, examined and tested its operation. Both of these witnesses found that they could force their hands into the press. They found also that the cords were so far out of adjustment that plaintiff could have inserted either arm into the press up to the armpit. In performing her work on the day of the accident plaintiff was required to reach into the press a distance of about 12 inches. The device was adjusted to permit an entry of 20 inches thus resulting in approximately 8 inches of slack in the cord which had to be taken up before the device would effect a withdrawal of a hand that had been inserted the maximum distance of 20 inches into the press. The evidence shows that at the time of the injury plaintiff's arm extended about 16 inches into the press. In testifying as to the manner in which she made a finger clearance test plaintiff said she 'made the test with the ram all the way to the bottom.' This is not the proper method of making the test as shown by the instructions and illustrations appearing in defendant's booklet. Keck testified he instructed the plaintiff and all others working on the Seybold press to read the booklet which he kept on his desk. Had she read the booklet plaintiff would have learned that a fingertip clearance test was to be made daily and that the test 'must be made with the work in the die so that safe clearance is assured between the top of the work and the upper die.' Although she did not read the booklet plaintiff during her many months of working on the press had seen the fingertip clearance test performed and had participated in such procedure. It is fairly to be inferred that she was aware of the importance of the test and of the necessity for correct and accurate adjustment of the device. It was plaintiff's duty during the two days Keck was absent as well as on all other occasions when she

worked to use her faculties of sight and hearing and her intelligence to discover and avoid danger. Plaintiff insists that on the morning of the accident she made the clearance test in the manner advised by Keck and that it showed her fingers to be free of the descending ram. Her testimony must be weighed with the testimony relevant to the maladjustment of the press as found immediately after the accident and all other evidence relative to the issue of contributory negligence. Whether there was a maladjustment of the device at the time of the accident that proximately caused or contributed to cause plaintiff's injuries and if so whether plaintiff herself negligently contributed to proximately cause such maladjustment are questions upon which reasonable minds might disagree. This is sufficient to justify a charge on contributory negligence."

The Court instructed the jury that the burden of proving contributory negligence rested upon appellee company. Under the circumstances above outlined, we find no error in the submission by the trial court of the issue of contributory negligence.

■ It is claimed by appellant that when the jury advised the Court it was unable to reach a unanimous verdict, the trial judge committed reversible error in making the following statement to the jury:

"Now I am sure all of you appreciate the desirability of agreeing on a verdict. This case has taken a long time to try, and your failure to agree upon a verdict will necessitate another trial almost as long. And I doubt that the case could again be presented more clearly or better than it has been by the parties in this case.

"If a larger number of the jurors take a position different from that of a minority, I suggest that those in the minority examine their views in the light of the argument advanced by the majority.

"If there be an unequal division of the jurors, those in the minority should more carefully scrutinize the evidence to determine the correctness of their own opinions."

The Court then said:

"I do not suggest that *any* juror surrender his or her honest convictions. The verdict to which *each* juror agrees must be his or her own verdict as the result of his or her own convictions. Yet *each juror* should examine the question submitted with candor and with a proper regard and deference for the opinion of his or her fellow jurors. * * * *No juror* should permit obstinancy or pride of personal opinion or any other consideration to interfere with a fair consideration of the reasons and opinions advanced by other members of the jury." (Emphasis supplied.)

As observed by appellee, it is not known whether there was a minority at the time of the instruction, or, if there were a minority, whether it favored the appellant or the appellee.

In Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, the Court had occasion to pass upon similar instructions and stated:

"The * * * assignments [of error] were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case

if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

The Court held that there was no error in these instructions.

Moreover, it appears that appellant's attorney had been advised prior to the giving of the foregoing instruction, that such an instruction would be given and no objection was made either at that time or after the giving of the instruction. Following the instruction, the jury deliberated for all of that afternoon and the following morning, the verdict being returned on the afternoon of the following day. We do not consider that the instruction complained of was in any way coercive or erroneous. As to the claim that the trial judge should have held as a matter of law that appellee company was negligent in failing to warn the Paper Company not to use the safety device for a greater entry than specified, we consider that the Court properly refused so to hold. What has already been said with regard to the fact that the Paper Company purchased the safety device subject to the right to return it after its own experimentation, use, and adjustment, if it did not fulfill what is considered proper protection for the employee, applies to the argument of appellant in this regard.

We have considered the claims of prejudicial error that the District Court improperly sustained appellee company's objection to a certain question, on cross-examination, directed to Mr. Fobes, the Vice President and Shop Foreman of appellee company. The testimony sought by this question was elicited elsewhere in the cross-examination of Mr. Fobes. It appears that the question to which the trial court sustained an objection was only in the nature of a summation, rather than an exclusion of the evidence; and the ruling of the Court was not prejudicial. Nor did the Court commit prejudicial error in admitting into evidence a diagram which illustrated the bed of the press and the adjustment of appellant Yount's safety device at the time of the accident. Testimony concerning the meetings of the Safety Committee of the Paper Company was properly admissible in evidence as bearing upon the expertness on the part of the Paper company; its lack of reliance upon appellee; the conditional nature of the sale; and the continued experimentation by the Paper Company to adapt the device to many varied jobs which were not initially contemplated. Moreover, it disclosed the Paper Company's familiarity and experience with appellee's safety device and went to establish that the Paper Company purchased the device in reliance on its own experience, and not upon any warranties that could be said to have been made by appellee company.

In accordance with the foregoing, we find no reversible error on the part of the trial court. The case was complicated and was carefully tried by an experienced judge, who was meticulous in his determination of, and rulings upon, the arguments and objections of counsel. The jury gave unusual consideration to the case, and brought in its verdict after two days of deliberation. No reversible error appearing, the judgment of the District Court is affirmed.