In the Interest of J. Z., a child.

William H. BLORE, Petitioner and Respondent,

v.

John Z. and Susan Z., Respondents and Appellants.

No. 8712.

Supreme Court of North Dakota.

Sept. 7, 1971.

Russell K. Schmidt, of Bosard, Mc-Cutcheon, Kerian & Schmidt, Minot, for respondents and appellants.

Wallace D. Berning, Asst. State's Atty., Minot, for petitioner and respondent.

DOUGLAS B. HEEN, District Judge.

John Z. and his wife, Susan Z., have appealed, asking trial de novo, from a district court judgment terminating their parental rights to their son, J. Z., born to their marriage on February 24, 1970. We affirm the judgment.

On August 14, 1970, Lynn Aas, manager of a Minot medical clinic, reported to Cal Asendorf, a Ward County Juvenile Supervisor, that there was reasonable cause to believe that J. Z., a five-month-old baby being attended by the clinic staff, had suffered serious injury or was suffering physical neglect not explained by available medical history as being accidental in nature. This report is required by N.D.C.C. Sec. 50–25–01. Immediate temporary placement in a foster home was ordered, and the child has been in a foster home since his release from the hospital.

On August 28, 1970, a petition signed by William H. Blore, Juvenile Supervisor, was filed in the Juvenile Division of District Court for Ward County, alleging that J. Z. was a deprived child, which condition was likely to continue, and asking that parental rights of John Z. and Susan Z. be terminated. At the appellants' request, the proceedings were continued and came on for hearing on October 29, 1970, with a concluding hearing on November 12, 1970.

The trial court terminated the appellants' parental rights, finding beyond a reasonable doubt that J. Z. suffered serious physical injuries because of mistreatment by his father, John Z., as follows: that on or about August 13, 1970, the father by force inserted a toy telephone into the mouth of the child, nearly causing his death by suffocation; that shortly before the above occasion, the father forced or induced a boiling liquid or very hot substance into J. Z.'s mouth, causing serious burns to his throat; and that previously J. Z. received numerous bruises on different parts of his body and five fractured ribs which were the result of striking, slapping, dropping, or other rough treatment by his father; that the mother, Susan Z., acquiesced in this treatment; that J. Z. thereby was a deprived child; and that such treatment by the parents was likely to continue and would probably cause J. Z. serious physical, mental, moral, or emotional harm.

An appeal taken under the Uniform Juvenile Court Act, N.D.C.C. 27–20, is triable anew in this Court. In re Walter, 172 N.W.2d 603 (N.D.1969).

The trial court judgment is attacked on the ground that the appellants made incriminating statements to a juvenile supervisor in the absence of counsel; that there was error in the admission of expert medical testimony; that the statutory definition of deprived child is unconstitutional for vagueness and uncertainty; that the appellant parents were denied their constitutional rights by this termination; and that the evidence does not support the judgment.

The fundamental natural right of a parent to the custody and society of his child and to provide for his moral, mental, and physical welfare has been recognized to be of constitutional dimension. This, however, is not an absolute right. Mitchell v. Davis, 205 S.W.2d 812, 12 A.L.R.2d 1042, 1047 (Tex.Civ.App.1947), in disposing of a somewhat similar issue, held that such fundamental rights are not absolute

and employed the following language appropriate to the proceeding at hand:

"While ordinarily the natural parents are entitled to the custody and care of their child, this is not an absolute unconditional right. The State has such an interest in the welfare of its citizens as will authorize the enactment of suitable legislation by which the State may assume the custody of children and the parents may be deprived of the custody thereof where the parents abandon the children or neglect them in such manner as to cause them to become a public charge, or where the parents otherwise prove to be unsuitable."

Mitchell v. Davis, *supra*, quoting De Witt v. Brooks, 143 Tex. 122, 182 S.W. 2d 687, 690 (1944).

The North Dakota Juvenile Court Act likewise acknowledges the inherent right of parents to their child's custody and to care for his welfare, the act providing that its interpretation and construction shall be:

To achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only when necessary for his welfare or in the interest of public safety.

North Dakota Century Code, Sec. 27–20–01(3).

Accordingly, any judicial disposition of J. Z. may be made only if the child is brought within the jurisdiction of the trial court as a "deprived child."

The Juvenile Court Act, N.D.C.C. Sec. 27–20–02(5), defines a "deprived child" as a child who:

a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents * * *;

and our law requires that the court's finding that a juvenile is a "deprived child" be by clear and convincing evidence. N.D.C. C. Sec. 27–20–29(3).

This proceeding is based upon N.D.C.C. Sec. 27–20–44, which in part provides:

1. The court by order may terminate the parental rights of a parent with respect to his child if:

\* \* \* \* \* \*

b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm;

\* \* \* \* \* \*

North Dakota Century Code.

Not only must the trial court find that a child is deprived by clear and convincing evidence, but the probability of continuance of deprivation must be by the same degree of proof before there may be a termination of parental rights under this section of our law.

On trial, the evidence developed that early on the evening of August 13, 1970, half of a toy telephone, the broken part first, lodged in J. Z.'s throat. His parents rushed him to a Minot Hospital, where the broken toy was extracted by Dr. Fred Erenfeld, who fortunately happened to be at the hospital. At the time, Dr. Erenfeld thought the baby was dead. Following extraction and resuscitation procedures, the baby's own doctor, Dr. Gunay Raghib, having arrived at the hospital, assumed care of the child. Upon examination, Dr. Raghib found the child to be bruised below his umbilicus, to have a half-inch laceration at the soft palate, to be bleeding from his nose and mouth, and to be in shock and exhibiting evidence of pneumonia.

It was Dr. Erenfeld's opinion that lodgment of the toy rattle in the baby's throat

was not accidental but required outside force. Dr. Raghib was of the opinion that J. Z., a baby of five months, did not insert the rattle into his own throat nor did he have the strength to break the toy.

During his subsequent hospitalization, the baby would not swallow and did not eat. Again the child was examined by Dr. Raghib, who concluded that this complication was caused by burns, probably chemical in nature, to the child's mouth and throat tract, the esophagus, to the stomach. This, in his opinion, occurred one day, and not more than two days, prior to J. Z.'s admission to the hospital. Dr. Raghib could find no rational cause or explanation for these internal burns, stating that because of the age of the baby, the liquid or substance causing the burns, of necessity, had to appear in the baby's bottle; that, while the liquid causing the burns may have been given accidentally, yet the baby would not take the substance accidentally, because he would reject the burning substance or liquid. From this, the inference arises, in the opinion of Dr. Raghib, that the baby was prevented from so rejecting the liquid or substance causing the burn.

Dr. Dionisio Libi, a throat specialist, examined the baby on August 18, 1970, in consultation with Dr. Raghib and concurred in finding severe chemical burns to the mouth and throat of the child. Although unable to account for the cause of the burns, Dr. Libi did state that the burns had to be forced.

X-rays taken of J. Z. during his August period of hospitalization to aid in the treatment of his pneumonia, revealed five healing rib fractures to his left side. These fractures, according to Dr. Raghib, could only have been caused by application of strong force and probably had occurred some weeks before.

Some two months earlier, June 1970, J. Z. was briefly admitted to the hospital for treatment of an infected nose and throat by Dr. Raghib. On admission, the child had four or five bruises on his left chest, a bruised right cheek and pelvis. The youngster was x-rayed but apparently not extensively enough to disclose the fractures, if such existed at the time.

Four days after J. Z. was hospitalized, on August 17, 1971, the Juvenile Supervisor, Mr. Asendorf, interviewed both parents at his office relative to the events surrounding lodgment of the toy rattle in J. Z.'s throat. At the time, the parents were not represented by counsel. During trial, on direct examination, and without objection, Mr. Asendorf related portions of the interview. On cross-examination, the appellant parents' counsel developed that Mr. Asendorf did not, either before or during the interview, advise the parents of a right to counsel before discussion of these events with the Juvenile Supervisor. Appellants' attorney then, for the first time, objected to Mr. Asendorf's "prior" testimony. The overruling by the trial court of this objection is assigned as error on this appeal, the appellant parents claiming their statements were privileged because made at an informal adjustment conference.

█ A party is entitled to counsel at all stages of any proceeding under the North Dakota Juvenile Court Act. N.D.C.C. Sec. 27–20–26. Parental termination procedures are a part of the Juvenile Court Act, and the right to counsel extends to parties involved in such proceedings.

In appropriate instances, before a petition under the Juvenile Court Act is filed, there may be an informal adjustment of differences—that is, court-sponsored counselling, advice, and imposition of "conditions for the conduct and control of the child" if there is jurisdiction, if in the best interest of the public and the child, and if "[t]he child and his parents * * * consent thereto with knowledge that consent is not obligatory." N.D.C.C. Sec. 27–20–10. This section further provides that incriminating statements made during "informal adjustment" are privileged.

█ Consideration of the statute in question, N.D.C.C. Sec. 27–20–10, leads to

the conclusion that "informal adjustment" has application only to a child—that is, an individual under eighteen years of age, unmarried, and not a member of the armed services [N.D.C.C. Sec. 27–20–02]—who is alleged to be delinquent, unruly, or deprived. Being so excluded by the implicit language of the statute, parents involved in parental termination proceedings are not entitled to the benefits of informal adjustment.

During this initial interview with the parents, the juvenile supervisor was proceeding under N.D.C.C. Sec. 27–20–06, which empowers him in that capacity to make investigations, to receive and examine complaints and "charges of * * * deprivation of a child for the purpose of considering the commencement of proceedings * * *." He was not simply screening a complaint to determine if there was jurisdiction or if there was no evidence substantiating the complaint. Rather, he was functioning as a law enforcement officer gathering evidence, on the one hand, and, on the other, determining whether there would be court proceedings to terminate parental rights. At the outset of the initial interview which was a critical stage [1] in these proceedings [Leach v. Texas, 428 S.W.2d 817 (Tex.Civ.App.1968)], the parents, although not entitled to informal adjustment, should have been advised of their right to counsel and should have been afforded the opportunity of consulting a lawyer before proceeding with the initial interview. N.D.C.C. Sec. 27–20–26.

■■ In the case at hand, however, as noted, the appellants did not object to Mr. Asendorf's direct testimony detailing his conversation with the appellant parents at the initial interview; and, as stated, it was not until commencement of cross-examination that there was such an objection. Timely objection not having been made, and there being no motion to strike such evidence from the record coupled with a showing of surprise, Mr. Asendorf's direct testimony was properly received. Hoffer v. Burd, 78 N.D. 278, 49 N.W.2d 282 (1951); State v. Boehm, 68 N.D. 340, 279 N.W. 824 (1938); 23A C.J.S. Criminal Law § 1078(c), at pp. 73–74 (1961). See: 2 Wright, Federal Practice & Procedure Sec. 408, at 106.

Juvenile Supervisor Asendorf's direct testimony was identical, save in some small detail, to that given by the appellant parents, John Z. and Susan Z., as such is hereafter summarized.

Both of the baby's parents, the father, John Z., and the mother, Susan Z., testified at the trial. Neither their testimony, whether for or against the other spouse, nor that of the doctors in any particular, is privileged under North Dakota law. N.D.C.C. Sec. 50–25–05.

A summary of the testimony of the child's mother, Susan Z., follows:

She testified that the father, John Z., was bottle-feeding the baby in the front room while she was on the telephone in the kitchen. The father appeared in the kitchen, with the child, who was bleeding from the mouth, in his arms, and said, "Get something out of his throat." Unsuccessful in their efforts to remove the foreign object from the baby's throat and sensing the extremity of the situation, the parents rushed J. Z. to the hospital.

She could offer no explanation of the baby's body and facial bruises and contu-

---

1. Ferster, Elyce Z., Courtless, Thomas F., and Snethen, Edith N.: Separating Official and Unofficial Delinquents: Juvenile Court Intake, 55 Iowa Law Review 864 (1970) (Soc. and Rehab. Service, Youth Dev. and Delinq. Prevention Adm'n, U.S. Dept. of Health, Education, and Welfare Pub. 1971); Sheridan, W. H.: Standards for Juvenile and Family Courts, p. 53 (U.S. Children's Bur.Pub.No.437 (1966)); NCCD Council of Judges, Model Rules for Juvenile Courts, Rule 3 and comment.

sions, other than that the father at times played roughly with the child. From time to time, she did question her husband about the baby's injuries, of which he denied all knowledge. She did remark that his rough play with the child should stop. At times, the father physically abused the mother. On one occasion the mother called her pastor to the home. In the course of his ministering, the pastor observed that the baby was bruised and counseled that J. Z. be taken to a doctor. The mother, however, did nothing.

The mother disclaimed any knowledge of how the baby's ribs came to be fractured. She never at any time saw the baby mistreated, and she stated that the only punishment ever administered by her husband was to put the child to bed when he cried.

Neither could the mother account for her child's throat burns, except that a couple of days before the baby's admission to the hospital for emergency extraction of the rattle, the father may have given him boiling water.

Just before the rattle incident, the mother saw the toy, then in one piece, in the crib. She could not explain how the rattle came to be broken or how half of the damaged toy lodged in the baby's throat, but she did suspect that her husband had something to do with it.

For his part, the father testified that while the mother was answering the phone in the kitchen, he put the baby "in his crib, braced his bottle up with his blanket and gave him his rattle," which was then in one piece, and left to get a pacifier. When John Z. returned, the child had the rattle up to his lips, and then events moved swiftly, in the words of the father:

Yes, I just returned with his pacifier, and I don't know, it happened so fast. I remember vaguely, remember trying to get a portion of the rattle out of his mouth, and I tried to get his mouth open,

and I don't know, the more I tried, the farther down it went, so I held him upside down, and I hit him on the back, hard, a couple of times. He started bleeding. That is when I ran in and got my wife.

Upon being asked if he remembered the rattle breaking—which, as noted earlier in this decision, Dr. Raghib described as being too substantial to have been broken by this baby—John Z. replied:

No, I don't, not actually how it broke or anything. I can't remember. I don't know if it was broke off before it went in the mouth, or it snapped off prior to being—me coming into the room or anything. When I come into the room, he had it up to his lips. Everything happened so fast. * * *

He further testified he had no memory of placing the rattle in the baby's mouth.

Several members of the families of the parents testified as to the bruises appearing from time to time on the baby's body, of their apprehension for the child, and of the fact that such concern had been expressed to these parents. The father and the mother described how the father would blow with some force upon the child's neck and body and said they thought this could be a possible source of the bruises.

The father admitted that he had a quick temper, that he had physically abused his wife on occasion, and that he was institutionalized for alcoholism in April 1970 until the first part of the following June.

It is significant that some of the bruises, the fractured ribs, the burned mouth and throat tract, and the rattle lodgment sustained by this baby all occurred after completion of the father's alcoholism treatment and while the father was alone, or had been alone, with the child.

After commencement of these proceedings, the father was interviewed by a clinical psychologist, Dr. Robert Edmunds, who

at the trial testified that the father, among other things, was a danger to himself and others and that his life style would remain relatively unchanged.

In addition, the parents undertook marriage counseling during pendency of this proceeding. A family therapist, Mrs. Mary Ekberg, a consultant with a medical clinic, believed that while John Z. and Susan Z. at the time of trial were not fit and proper parents, yet was of the opinion that in a year they could become so with proper counseling. This conclusion was supported by testimony of the clinic psychiatrist, Dr. R. O. Saxvik, who worked in conjunction with the family therapist and who testified on behalf of the appellants. He was of the opinion that the father, John Z., was not neurotic or psychotic but was immature, antisocial, and possessed a character disorder. This expert witness could give no idea of the length of time required to overcome these difficulties.

Testifying for the State, Dr. Raghib on direct examination, over objection, termed J. Z. a battered child. The appellants contend that the term *battered child* is synonymous with *deprived child* and that the expression of this opinion by the doctor prejudiced their case. The term *battered child* is directly related to N.D.C.C. Sec. 50–25–01, which in part provides:

Any physician * * * having reasonable cause to believe that a child under the age of eighteen years coming before him for medical examination, attendance, care, or treatment has suffered serious injury or physical neglect not explained by the available medical history as being accidental in nature, shall make written report of such fact * * * to the appropriate juvenile commissioner.

* * * * * *

North Dakota Century Code.

This section further requires disclosure by the doctor of "any other information which may be helpful in establishing the cause of injury or neglect and identity of the perpetrator."

■ Accordingly, the doctor by statute is required to express his opinion based upon reasonable cause if he believes a patient is a battered child. The terms *deprived child* and *battered child* do not constitute an opinion on the ultimate issue of this case and were admissible testimony to be considered with all other evidence in the case.

The case of In re Larry and Scott H———, Ohio Juv., 92 Ohio L.Abs. 436, 24 Ohio Op.2d 334, 192 N.E.2d 683 (1963), cited by the appellants in support of their argument, is not of assistance to them. That case held that expert opinions, while helpful, are to supplement rather than supplant courts' judgments, and that courts are not required to accept opinions of expert witnesses as conclusive of issues of fact. With this we do not disagree.

The appellants next argue that the evidence produced at the trial does not support the findings of fact made by the Juvenile Court in this case.

■ On appeal, although the findings of fact by the trial court are accorded appreciable weight, the Supreme Court is not bound thereby but has the duty to review all evidence, to find the facts anew independently of the trial court's findings, and to apply the law to the facts as found by the appellate court. Verry v. Murphy, 163 N.W.2d 721 (N.D.1968); Kelmis v. Cardinal Petroleum Co., 156 N.W.2d 710 (N.D. 1968); Wheat v. Patterson, 154 N.W.2d 367 (N.D.1967).

■ The trial court's termination of the appellants' parental rights was based upon findings of fact proved beyond a reasonable doubt, whereas the requisite degree of proof is by clear and convincing evidence. This higher degree of proof as employed

by the trial court, if accorded appreciable weight in the Supreme Court, so appellants claim, effectually precludes them from even a possibility of a successful attack on this court's finding as not being sustained by clear and convincing evidence.

The appellants' argument in this respect is not persuasive. Certainly, the appellants were not prejudiced in the trial court because the State was required to establish its case by proof of a higher degree than the requisite "clear and convincing evidence." This served only to place a greater burden upon the State, to the appellants' advantage.

■ After independent appraisal of the facts in this case, this Court finds that J. Z., the child here involved, is a deprived child within the meaning of N.D.C.C. Sec. 27–20–02(5). The baby's fractured ribs, the broken rattle forced into his throat, the child's burned mouth and throat tract, the various bruises on his face and body, under the circumstances as detailed by the doctors and other witnesses, are clear and convincing evidence that there was an absence of proper parental care. It is significant, as earlier stated, that these badges of abuse are unexplained and and that all appeared, excepting possibly the fractured ribs, only after the father, John Z., had been alone with the baby. So much of the abuse of the baby as was known or suspected by her was accepted by the mother, Susan Z., who thereby failed to protect, nurture, and care for the child. Such passive acceptance by the mother amounted to acquiescence and likewise is clear and convincing evidence of omission of proper parental care.

■ The appellants' counsel contends that the evidence in this case lacks probative force because it is largely, if not entirely, circumstantial. But that is not the law in this State. Proof of the elements of an action or proceeding may consist entirely of circumstantial evidence. State v. Emmil, 172 N.W.2d 589 (N.D.1969); Hol-

comb v. Striebel, 133 N.W.2d 435 (N.D. 1965). In this case, the facts and circumstances proved were consistent with the theory of absence of proper parental care and inconsistent with any other rational theory. As in State v. Jager, 85 N.W.2d 240 (N.D.1957), the circumstances here do not give rise to any inference that the misfortunes of J. Z. were just a series of unfortunate coincidences.

It is further found by this Court by clear and convincing evidence that the conditions and causes of the deprivation are likely to continue, and that by reason thereof the baby is suffering and will probably suffer serious physical, mental, moral, or emotional harm; and that clear and convincing evidence supports the trial court's judgment terminating the appellants' parental rights to J. Z., their child.

■ Finally, the appellants attack the district court judgment terminating their parental rights on the ground that the North Dakota statutory definition of "deprived child", N.D.C.C. Sec. 27–20–02(5), is unconstitutional for vagueness and uncertainty. It is their claim that the trial court decree of termination deprives them of their constitutional right of due process guaranteed them by the Constitutions of the United States and of the State of North Dakota.

It is a general principle of statutory law that a statute must be definite to be valid. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. On the other hand, where the words assailed, taken in connection with the context, are commonly understood, their use does not render a statute invalid. * * * (footnotes omitted)

\* \* \* \* \* \*
* * * If a statute is so designed that persons of ordinary intelligence who

would be law abiding can tell what conduct must be to conform to its requirements and it is susceptible of uniform interpretation and application by those charged with the responsibility of enforcing it, it is invulnerable to an attack for vagueness. * * * (footnote omitted)

16 Am.Jur.2d Constitutional Law Sec. 552, at 951–52 (1964).

In State v. Henderson, 156 N.W.2d 700, 706 (N.D.1968), this Court, citing United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 598, 9 L.Ed. 2d 561 (1963) stated the test for determining whether a statute is void for vagueness and uncertainty as follows:

Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.

The North Dakota statute providing for termination of parental rights, which defines a deprived child as one "without proper parental care or control," afforded the appellants a commonly understood and well known standard to which their conduct and responsibility must conform. Mitchell v. Davis, 205 S.W.2d 812, 12 A.L. R.2d 1042 (Tex.Civ.App.1947), *supra*. The meaning of the questioned statutes is plain and not subject to varying impressions of those attempting to comply with the statutes and those attempting to enforce those laws. The appellants were accorded due process under the statutes here involved.

The judgment is affirmed.

ERICKSTAD, Acting C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.

STRUTZ, C. J., was absent and did not participate; DOUGLAS B. HEEN, District Judge of the Second Judicial District, sitting in his stead.