201 N.W.2d 118 (1972)
In the Interest of A. N., a child.
Patricia KINGSLEY, Petitioner and Respondent,
v.
W. N. et al., Respondents and Appellants.
Civ. No. 8789.
Supreme Court of North Dakota.
September 26, 1972.
*119 Jack Marcil, Asst. State's Atty., Fargo, for petitioner and respondent.
Benjamin C. Pulkrabek, Fargo, for respondents and appellants.
JAMES H. O'KEEFE, District Judge.
Juvenile proceedings were brought alleging A. N., now age three, to be a deprived child and asking that the parental rights to her be terminated. The Honorable Ralph B. Maxwell presided at the hearing on April 2, 1971, at which time the parents, their attorney, and others were present. The State presented seven witnesses and the parents also testified. The court found the allegations to be true and itemized in detail particular acts and attitudes of abuse and found the deprivation likely to continue. Parental rights were terminated, custody arrangements were made, but the order of termination was not to be final until October 4, 1971.
On September 11, 1971, the parents filed a new petition alleging changed conditions and asking for custody of the child. On September 21, 1971, Judge Maxwell heard the matter. Again, he found deprivation and grounds for termination, and he confirmed his previously announced termination date for October 4, 1971. In his memorandum opinion, filed October 4, 1971, he acknowledged the staying of the termination order for six months to be a "singular act". He was hesitant to permanently sever the ties, though convinced the evidence so warranted, and gave the parents another chance to "amend their ways" and then merit reconsideration. In a well-reasoned review he concluded that only the father now rose to the demands of the occasion, and the mother, for whatever reason, was not competent to have care of the child. The parents appealed, demanding a retrial on the files and transcript.
The beginning premise, which this court well understands, is that the parents have a fundamental natural right to their child. But it is not an absolute, unconditional right. In re J. Z., 190 N.W.2d 27 (N.D.1971). The Juvenile Court Act affirms this in its preamble.
The transcript reads like a catalog of daily gross and grinding abusea flesh and blood story of tragic proportions. One could hardly set out to create such a case of pitiful deprivation. A list of such abuses follows, by no means complete: The child was born April 23, 1969, and ten days thereafter sustained a broken arm and bruising. The welfare board homemaker reported the child had very few clothes, that she was always wet and crying and not fed and quite often had black and blue marks. The mother had lame explanations, but did once admit to hitting her in the eye with a spoon because she wouldn't eat. The family moved from Jamestown to Fargo in October 1969 and the child was removed from the home. She showed little progress for her age. The mother had a cat and a dog, and the homemaker was amazed at how much care she gave to them. The child was treated by a medical doctor in December 1970 for facial bruises. At that time she was suspected of being a "battered child", although solid evidence on this is sparse. In April of 1970 she was returned to the home with a care schedule provided. The parents were reluctant to follow it. The mother showed no emotion toward A. and carried the child in an unusual manner. The mother complained that the child was lazy and spoiled. There was little bathing even after diaper removal. The mother resented the baby's soiling diapers. Consistently the child showed bruise marks over all her body. General housekeeping was poor and even worse in the child's room. The father did seem concerned about her care, but was unable or unwilling to act. While at a day-care center the child received spoiled milk from her parents. There was no interaction between the parents and child. They simply ignored her. In fairness to the parents, they were beset with multiple problems of their own. He is 39 and she is 24.
After the court hearing in April of 1971 and before a second hearing in September *120 of 1971, the parents (the father especially) made some progress putting their own house in order. The mother had mental testing; she expressed love and concern. They settled into what they believed was a permanent location and the father began working steadily and purchased an adequate home. Opposed to this, the mother told the mental health center people she didn't want to go there any more, didn't want them in her house if the child was returned, and later told the caseworker the same thing. The parents saw a professional counselor. He testified that they had a "deep love" and a "concern" for the child and wanted her back. He further said that they would be competent parents. This court does not accept the conclusion of this counselor, nor are we required to accept expert opinions. In re J. Z., supra, page 34. We cannot ignore a case history that leads to an opposite conclusion. While the parents have verbalized love and concern, there is inadequacy in translating this to performance. A psychologist, Dr. John Wallace, also labels the mother a weak person with few capacities to deal with pressure. His diagnosis: schizophrenic and paranoid. The child is now making normal progress in the foster home.
We shall deal specifically with appellant's five specifications of error.
(1) There was insufficient evidence of a battered child syndrome. This court would agree with such contention, although there is strong evidence the child was mistreated. Perhaps the "syndrome" was absent, but the battering wasn't. A syndrome, by definition, is a group of signs that collectively point to a disorder (American Heritage Dictionary, 1969). In any event, this was only part of the total findings of the trial court.
(2) The parents showed more than adequate reason why the termination should not be finalized. This argument is the most persuasive. It is true that the home has stabilized. As Judge Maxwell pointed out, the attitude of the mother in not wanting further professional help or interference is inexplicable. Environmental changes unfortunately do not always work corresponding attitude changes. The gross neglect of the child raises questions beyond identifiable changes in living patterns. As the child grows older, the forms of abuse may become more subtle, if not more flagrant.
(3) The mother did not state that she would not accept professional help. We think the evidence substantiates that she did resent interference. Appellant makes a valid point about the fairness of asking welfare aid and then turning that information against her. It is a pervasive dilemma when welfare seeks to help and then becomes an accuser. The only justification for it is that the object of our concern is the child and not the parents' feelings. We know of no other way to adequately protect the child.
(4) The evidence fails to clearly and convincingly prove the child is a deprived child. We do not accept this conclusion, as the facts already stated so indicate.
(5) There is no evidence that the deprivation will likely continue. We have already dealt with this in our prior discussion. There is good reason to believe the past will be repeated in different forms.
What is the scope of our review in juvenile cases? We are troubled with a seeming conflict between the Uniform Juvenile Court Act (Chapter 27-20, N.D.C.C.) and Rule 52(a) of the North Dakota Rules of Civil Procedure. Section 27-20-56(1), N. D.C.C., says, in pertinent part:
"The appeal shall be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court."
Rule 52(a) says:
"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the *121 trial court to judge of the credibility of the witnesses. . . ."
It is obvious that the adoption of Rule 52(a) in August of 1971 as an amendment to the existent Rules was designed to set a new standard for reviewing questions of facta standard that gives the trial judge more finality of decision. The 1971 session of the Legislature (Senate Bill 2252) abolished the so-called "de novo" statute. Accordingly, Rule 52(a) was amended to conform to the Federal Rule 52 (a) and includes the scope of review given to findings of fact by the trial court.[1] The Federal Rule applies to any civil action tried without a jury save for the exceptions and limitations stated in Federal Rule 81, Wright & Miller, Federal Practice and Procedure: Civil § 2572. Our Rule 81(a) states as follows:

"RULE 81

"APPLICABILITYIN GENERAL
"(a) Special statutory proceedings. The statutory proceedings listed in Table A are excepted from these rules in so far as they are inconsistent or in conflict with the procedure and practice provided by these rules."
Table A excepts Chapter 27-16 of the North Dakota Revised Code of 1943. This is the old juvenile court procedure that was repealed and replaced by the present Uniform Juvenile Court Act (Chapter 27-20, N.D. C.C.). The adoption of the amended Rule 52(a) has not eliminated the existence of Rule 81 and Table A.[2] Insofar as the Act and Rule are in conflict or inconsistent, the Act must prevail, because of the provisions of Rule 81.
Section 27-20-56, N.D.C.C., of the Act, appears to be a return, in juvenile cases, to the old de novo statute, Section 28-27-12, N.D.C.C. It provides for a type of trial anew, giving appreciable weight to findings. As much as we would like to avoid a return to old ways and the attendant discomfiture for both appellants and trial courts, we cannot avoid the clear wording of Section 27-20-56, N.D.C.C. Such an interpretation affirms what we said in In re J. Z., supra,[3] and the general history of Federal Rule 52(a), in that there are several special proceedings in which the Federal Rule is inapplicable. Wright & Miller, supra, §§ 2571-2573.[4]
We now discuss a side issue bearing on future termination proceedings. This court does not approve of a termination that is, in effect, prospective in operation. If a possibility of a correction in an existing situation exists, it would be preferable, we believe, to adjourn the hearing under a temporary order of placement without a future termination date. Upon a rehearing, if the conditions still exist, an immediate termination may then be made. A time lapse in the effectiveness of a termination order has a disruptive influence on both parent and child. It is with regret *122 that false hopes are raised, and we should discourage continuing controversy over child custody.
Our own reading of the record and the appreciable weight we give to the trial court's findings both convince us of the correctness of this decision. There is clear and convincing evidence the child is deprived and the causes and conditions are likely to continue and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.
The decision is affirmed.
STRUTZ, C. J., and ERICKSTAD, PAULSON and TEIGEN, JJ., concur.
KNUDSON, J., deeming himself disqualified did not participate; JAMES H. O'KEEFE, Judge of the Second Judicial District, sitting in his stead.
NOTES
[1] See Special Note prefacing Rule 52(a), Amendments to North Dakota Rules of Civil Procedure, dated June 28, 1971.
[2] Page iii of the Amendments contains the following language from the Order for Adoption and Promulgation:

"NOW THEREFORE IT IS ORDERED That said amendments to the Rules of Civil Procedure hereto annexed be, and the same are, hereby adopted and promulgated and become a part of the Rules of Civil Procedure for the regulation of pleadings, practice and procedure in the district courts of the State of North Dakota, and IT IS FURTHER ORDERED That the Amendments to the Rules of Civil Procedure so adopted and promulgated shall take effect and be in force from and after August 1, 1971." [Emphasis supplied.]
[3] Syllabus #1 of the court says an appeal taken under the Act is triable anew in the supreme court.
[4] For a history of Rule 52(a) see Wright & Miller, supra, § 2571.