In the Interest of R. W. B., a child.

Clarence O. OHLSEN, Director of Grand Forks County Social Service Center, Appellee,

v.

M. B. and B. B., Appellants.

Civ. No. 9185.

Supreme Court of North Dakota.

April 22, 1976.

Damon E. Anderson, Grand Forks, for appellants.

Thomas B. Jelliff, State's Atty. (argued), and Earle R. Myers, Jr., Asst. State's Atty., Grand Forks, for appellee.

Gary R. Thune, Grand Forks, for guardian ad litem.

James E. Leo, Grand Forks, for intervenors.

PAULSON, Judge.

The natural parents of R. W. B., a minor male child, appeal from an order of the Juvenile Court of Grand Forks County, which order terminated the parental rights of M. B., the father, and B. B., the mother, to the child R. W. B.

R. W. B. was born on May 30, 1974. On December 27, 1974, the Grand Forks County Social Service Center investigated an anonymous report that R. W. B. was not being properly cared for by his parents, M. B. and B. B. As part of its investigation, representatives of the Grand Forks County Social Service Center visited the home of M. B. and B. B., where they observed that R. W. B. had a sore on the back of his head, a splint on his right arm, and a discoloration around his left eye and on his forehead. The agency representatives, along with R. W. B.'s mother, B. B., took the child to a doctor for examination and treatment. The Grand Forks County Social Service Center, based upon its investigation and upon the medical report, petitioned the Juvenile Court of Grand Forks County for an order declaring that R. W. B. was a deprived child pursuant to § 27–20–02(5)(a) and (7), N.D.C.C., and requesting removal of custody of the child from M. B. and B. B., his natural parents. By order dated December 27, 1974, the juvenile court ordered that temporary custody of R. W. B. be placed in the Director of the Grand Forks County Social Service Center, pending a hearing on the petition.

On April 14, 1975, the juvenile court conducted a hearing on the petition, and by order dated April 18, 1975, placed R. W. B. under the care, custody, and control of the Director of the Grand Forks County Social Service Center until such time as the juvenile court should change such order.

M. B. and B. B. were arrested on January 3, 1975, and on March 25, 1975, they were convicted by jury verdict in the Grand Forks County Court of Increased Jurisdiction of the criminal charge of "Cruel Abuse and/or Willful Neglect of a Child", a violation of § 14–09–22, N.D.C.C. Each was sentenced to the county jail for a period of one year and fined $500. Neither appealed from the conviction or the sentence.

On August 12, 1975, the Director of the Grand Forks County Social Service Center filed an amended petition, pursuant to § 27–20–44, N.D.C.C., with the juvenile court, requesting that the parental rights of M. B. and B. B. to the child R. W. B. be terminated. M. B. and B. B. thereafter filed a motion seeking a continuance of the hearing on the petition until April 1976, which would, they contended, permit them to seek psychological treatment. After conducting a hearing on September 11, 1975, the juvenile court denied the motion for a continuance. On September 22, 1975, the juvenile court conducted a hearing on the amended petition. By order dated October 2, 1975, the juvenile court granted the petition and ordered that the parental rights of M. B. and B. B. to the child R. W. B. be terminated. It is from such order that M. B. and B. B. appeal to this Court.

Our scope of review in juvenile cases is broader than our scope of review in other cases tried to the Court. In the case of *In Interest of M. L.*, 239 N.W.2d 289 (N.D. 1976), in paragraph 1 of the syllabus, we held:

"1. Supreme Court's scope of review of decision made under Uniform Juvenile Court Act (Ch. 27–20, N.D.C.C.) is broader than in other cases tried to the court,

and is equivalent to former procedure of trial de novo."

We must therefore reexamine the evidence in reviewing the juvenile court's order terminating the parental rights of M. B. and B. B. to the child R. W. B. *In Interest of M. L., supra* 239 N.W.2d at 291; *In re J. Z.,* Syll. ¶ 1, 190 N.W.2d 27, 53 A.L.R.3d 592 (N.D.1971). However, although this Court is not bound by the juvenile court's findings of fact, such findings are entitled to appreciable weight. *In re H.,* Syll. ¶ 2, 206 N.W.2d 871 (N.D.1973); *In re A. N.,* Syll. ¶ 3, 201 N.W.2d 118 (N.D.1972); *In re J. Z.,* Syll. ¶ 7, *supra.*

Section 27–20–44, N.D.C.C., provides:

*"Termination of parental rights.—*

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

"a. The parent has abandoned the child;

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or

"c. The written consent of the parent acknowledged before the court has been given.

"2. If the court does not make an order of termination of parental rights it may grant an order under section 27–20–30 if the court finds from clear and convincing evidence that the child is a deprived child."

In the case of *In re H., supra,* in paragraph 1 of the syllabus, this Court held:

"1. Before a juvenile court may terminate the parental rights of a parent, three factors must be established by the evidence adduced at the termination hearing. These are: 1) that the child is a 'deprived child' within the purview of the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C.; 2) that the conditions and causes of the deprivation are likely to continue or will not be remedied; and 3)

that by reason of these continuous or irremediable conditions and causes the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."

The burden is on the State, as the party challenging the right of the natural parents to the care, custody, and control of their child, to prove by clear and convincing evidence the existence of all three of the above-quoted factors. *In Interest of M. L.,* Syll. ¶ 2, *supra; In re J. V.,* Syll. ¶ 3, 185 N.W.2d 487 (N.D.1971); *In re J. Z.,* Syll. ¶ 8, *supra.*

Our review being de novo, it is incumbent upon us to review the evidence in the instant case. While the record is voluminous, we have carefully reviewed it, and conclude that the basic facts can be summarized as follows:

—R. W. B. was born on May 30, 1974. His parents are M. B. and B. B., residents of Grand Forks. Between May 30, 1974, and December 27, 1974, R. W. B. was cared for exclusively by his parents, M. B. and B. B., except for the days during which he was left in the care of a licensed day care provider while B. B. was working.

—On December 27, 1974, representatives of the Grand Forks County Social Service Center investigated an anonymous complaint that R. W. B. was not being properly cared for by his parents. Undisputed medical evidence shows that R. W. B. was a severely injured child at such time. During a time span of two months, R. W. B. had suffered at least eleven separate bone fractures in his arms and legs. Expert testimony discounted any theory of accidental occurrence of such severe injuries, characterizing them, instead, as consistent with the "battered child syndrome".

—The parents of R. W. B. could offer no credible explanation for the occurrence of R. W. B.'s injuries. Their testimony, as well as the testimony of other witnesses (admitted over objection), indicated that M. B. and B. B. contended that they simply did not know how R. W. B. had sustained his injuries. The record also clearly shows that

neither parent sought adequate medical care for R. W. B.'s injuries until the Grand Forks County Social Service Center removed the child from the parental home.

—An investigation by the Grand Forks County Social Service Center revealed that M. B. and B. B. had had their first child removed from their custody and their parental rights to such first child subsequently terminated by the Cass County Juvenile Court. Over objection, the transcript of the termination proceedings in the Cass County action was admitted into evidence in the instant case. Such transcript reveals that the couple's first child suffered injuries, at approximately the same age, remarkably similar to those injuries suffered by R. W. B.

—The record also shows that B. B. and M. B. have both begun counselling with a therapist from the Northeast Region Mental Health Center, which therapist, Maxine Rasmussen, holds a Ph.D. degree in counselling and guidance, with a psychology minor. She testified that B. B. seems to be making progress in her ability to cope with stressful situations, and that the ultimate goal of the therapy is for B. B. to learn to cope with stress and frustration in an appropriate manner. However, the therapist also testified that neither M. B. nor B. B. had yet acknowledged that they had caused the injuries to R. W. B., nor was the therapist able to offer the juvenile court any definite timetable for their successful treatment. The therapist testified that, at best, such treatment would probably take more than one year. Furthermore, the therapist could offer no assurances that the type of injuries sustained by R. W. B. would not be repeated.

—Finally, two reports from H. E. Soufi, M. D., a psychiatrist, were admitted into evidence. Such reports were prepared by Dr. Soufi after he had examined B. B. Dr. Soufi reported that B. B. "wonders what happened" to her son; that she cannot remember the incidents which occurred, but that she does know that she has temper tantrums; that she seems to be requesting help; that as to her son, R. W. B., she is evasive and is using dissociation to forget about the child's injuries. Dr. Soufi concluded that B. B. has a history of impulsive tendencies and of doing things which were later forgotten. He indicated that her condition may lead to dangerous, irresponsible, unreliable, and impulsive acts. Dr. Soufi recommended a minimum of one year of psychiatric treatment for B. B., after which he would be able to offer a prognosis as to her potential for recovery.

■ The first question which we must answer in this appeal is whether or not R. W. B. is a "deprived child". Section 27–20–02(5), N.D.C.C., provides:

"*Definitions.*—As used in this chapter:

.    .    .    .    .

"5. 'Deprived child' means a child who:
"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;
"b. Has been placed for care or adoption in violation of law: or
"c. Has been abandoned by his parents, guardian, or other custodian."

In the instant case, there is no question but that R. W. B. was a "deprived child" as defined by § 27–20–02(5), N.D.C.C., and that such deprivation was not primarily caused by the lack of financial means of his parents. The record establishes, by clear and convincing evidence, that R. W. B. was subjected to severe physical abuse almost from the time of his birth until he was removed from the parental home. During such period of time—approximately seven months—R. W. B. suffered, among other injuries, multiple fractures to his arms and legs, for which his parents failed to secure proper medical care for him. The record clearly shows that both M. B. and B. B. knew about the child's injuries, yet neither attempted to obtain proper medical care for the child. Unlike the situations presented to this Court in the cases of *In Interest of*

*M. L., supra,* and *In re J. V., supra,* there was no "other care" provided for R. W. B. by his parents after they failed to provide the proper care.

Secondly, we must determine whether or not the conditions and causes of the deprivation are likely to continue or will not be remedied. M. B. and B. B. strenuously contend that the State has not proven this factor by clear and convincing evidence, and they raise a number of objections to the admission of certain evidence offered by the State, which evidence bears primarily on this factor. M. B. and B. B. contend that they have not been given an opportunity to seek treatment, and, therefore, that the order terminating their parental rights to R. W. B. was premature.

■ We agree with the contention by M. B. and B. B. that the natural parents have the paramount right to the child. *In re J. V., supra* 185 N.W.2d at 492. But such right is not absolute. *In re J. Z., supra.* The primary purpose of the Uniform Juvenile Court Act is to protect the welfare of the child. *In re J. V., supra* 185 N.W.2d at 491.

We have recently considered the use of prognostic evidence in parental termination proceedings, and adopted the approach used by the Supreme Court of Oregon. In the case of *In re H.,* 206 N.W.2d 871, 875 (N.D. 1973), this Court, citing with approval from *State v. Blum,* 1 Or.App. 409, 463 P.2d 367, 371 (1969), stated that the prognostic evidence must show:

"1) that the parent is presently unable to supply physical and emotional care for the child, with the aid of available social agencies, if necessary; and *2) that this inability of the parent will continue for time enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated.*" [Emphasis added.]

This Court remanded the case of *In re H., supra,* for a hearing on such questions, so that expert testimony could be offered on the prognosis for the mother's future ability to care for her child.

In the instant case, the question before us is not the same. Here there is evidence in the record dealing with the history and prognosis of the parents' ability to properly care for their child. It is therefore necessary for us, in light of the standard set forth above, to review such evidence to determine whether or not the State has sustained its burden of proving that the conditions of deprivation are likely to continue or will not be remedied. But, first, we must determine whether or not the juvenile court properly admitted certain evidence over the objection of M. B. and B. B.

M. B. and B. B. contend that the juvenile court erroneously admitted the following evidence:

1. The transcript and other testimony concerning parental termination proceedings in Cass County Juvenile Court regarding M. B., Jr., the first child of M. B. and B. B.;

2. The criminal record from the Grand Forks County Court of Increased Jurisdiction reflecting the conviction, after trial by jury, of M. B. and B. B. on a charge of child abuse;

3. Testimony by a medical doctor and by the guardian ad litem which recommended that the parental rights of M. B. and B. B. to the child R. W. B. be terminated; and

4. Testimony by Mrs. Irene Dybwad, of the Grand Forks County Social Service Center, relating to a conversation between herself and M. B. and B. B., while Mrs. Dybwad was investigating the child-abuse complaint.

M. B. and B. B. assert that the testimony and transcript of the Cass County termination proceedings is irrelevant to the proceedings in the instant case. They also assert that the juvenile court improperly used medical testimony contained in the transcript of the Cass County proceedings in determining whether or not the termination petition should be granted. We believe that the juvenile court properly admitted such evidence, and we conclude that the juvenile court did not improperly rely upon

medical testimony from the Cass County proceedings.

Section 27–20–29(4), N.D.C.C., provides, in pertinent part, that:

"4. In hearings under subsections 2 and 3 all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. . . ."

Such provision clearly shows that the Legislature intended that the court should consider all relevant evidence bearing upon the issues relating to the proper disposition of the case once the court has determined that a child is a "deprived child".

In *Harter v. State*, 260 Iowa 605, 149 N.W.2d 827, 829 (1967), the Iowa Supreme Court, in applying a statutory provision similar to § 27–20–29(4), N.D.C.C., held that evidence of the family's sociological history was admissible, because such history is an important factor in a case which seeks termination of the parental rights to a child on the grounds of abuse. The Iowa Court went on to say that evidence that the child's mother had physically abused her first child, and that her first child had subsequently been removed from her custody and placed for permanent adoption, was relevant to a determination of whether or not her parental rights to her second child should be terminated.

The Supreme Court of Nebraska, in the case of *In re Furrow*, 187 Neb. 64, 187 N.W.2d 586, 589 (1971), reached a similar conclusion, stating:

"The charge of neglect of children is a general one and an examination of what is for the best interests of such children necessarily involves *an examination of the continuous conduct and attitude of the responsible parent* together with all related circumstances. Ordinarily such an examination does not lend itself to the narrow resolution of guilt or innocence of a specific charge in time and place. Child care is a continuous concept and traditional notions as to formulation of issues in an adversary proceeding must give way to an examination in a larger perspective." [Emphasis added.]

In the case of *In re O'Beirne*, 194 Or. 389, 241 P.2d 874, 875 (1952), the Supreme Court of Oregon, in holding that evidence of how the mother treated other children while she was babysitting for them was admissible, said:

"The gravamen of the charge here is the maintenance of a home which, by reason of cruelty, is an unfit place for a child of tender years to live. It is the fitness of the environment in which the child dwells that is made a matter of public concern and judicial inquiry. The charge laid in this case comprehends more than subjecting the child to physical violence by those with whom he resides. *It encompasses, among other things, acts of cruelty toward others, particularly toward children of tender years, the very existence of which might inspire immeasurable fear and terror in the adopted son of the O'Beirnes with consequent deleterious effects upon his nervous system and mental outlook, adversely tincturing his own temperament and character. The law with tender solicitude endeavors to protect the child not only from physical abuses but seeks to remove him from an environment wherein cruelty in any of its objectionable manifestations may directly or indirectly prevail to his harm and impair his development as a useful and happily adjusted person.*" [Emphasis added.]

Finally, the Richmond County Family Court of the State of New York, considering a case similar to the factual situation presented to this Court in the instant case, held, in the case of *In re S.*, 66 Misc.2d 683, 322 N.Y.S.2d 170 (Family Ct., 1971), that evidence of a previous child-abuse case was properly admitted in a proceeding initiated to remove a newborn child from the custody of its parents. The New York Court concluded that the evidence was relevant to a finding that a pattern of neglect and child abuse existed and that the newborn child was "likely to suffer harm". For additional decisions following similar

reasoning, see: *In re S.*, 31 Cal.App.3d 112, 107 Cal.Rptr. 62 (1973); *In re Dunagan*, 74 Wash.2d 807, 447 P.2d 87 (1968); *In re K. D. E.*, 210 N.W.2d 907 (S.D.1973); Annot., 53 A.L.R.3d 605. We agree with and adopt the reasoning of the courts in Nebraska, Oregon, and New York, and conclude that evidence of the Cass County termination proceedings was relevant to the court's determination in the instant case that the deprivation of R. W. B. was likely to continue and that he would probably suffer therefrom.

Furthermore, we believe that the juvenile court did not improperly use medical testimony contained in the transcript of the Cass County proceedings in determining that R. W. B. was a "deprived child". All that the juvenile court used the medical testimony in the earlier hearing for was to show that M. B. and B. B. had both, of necessity, been informed that psychiatric treatment would be advisable for them.

We therefore find no error in the admission or use of the evidence concerning the termination proceedings conducted in Cass County.[1]

M. B. and B. B. next contend that the trial court erred in permitting introduction of the criminal record of their conviction by a jury of the crime of child abuse. They assert that this Court's decision in *Thornburg v. Perleberg*, 158 N.W.2d 188 (N.D.1968), prohibits the introduction of a criminal conviction, not secured by a guilty plea, in a subsequent civil proceeding. We do not agree.

In *Thornburg, supra*, the record of a criminal conviction was being offered in a civil action to prove a driver's negligence in the operation of his motor vehicle. As such, it was offered to prove the very fact at issue in the action. In the instant case, the introduction of the criminal conviction of M. B. and B. B. was offered as an additional piece of evidence that the deprivation suffered by R. W. B. was so severe that it would be likely to continue. Evidence of the conviction was not offered to prove that R. W. B. was deprived—the juvenile court already had sufficient evidence before it from which such a conclusion could be drawn—but was merely offered as another indication that a pattern of child abuse existed. As such it was relevant to the dispositional issue before the court, and therefore admissible.

M. B. and B. B. also contend that the juvenile court erred in permitting a medical doctor and the guardian ad litem to testify as to their respective recommendations on the question of termination. It is their contention that such testimony invaded the province of the court—whose duty it was to determine from the evidence whether or not the petition for termination should be granted.

In re J. Z., *supra* 190 N.W.2d 27, in paragraph 6 of the syllabus, this Court held:

"6. Testimony by a doctor that one is a 'battered child' is not an opinion on the ultimate issue of whether a juvenile is a 'deprived child' and was admissible testimony to be considered with all other evidence in the case."

The expert testimony in the instant case by Dr. Richard J. Blank, a medical doctor specializing in radiology, was to the effect that the injuries which he observed in this case were consistent with the "battered child syndrome"; were some of the most severe injuries he had ever seen in a seven-month-old child; and that he would "not recommend" that the child be returned to his

---

1. Such conclusion does not conflict with our recent decision in *State v. Stevens*, 238 N.W.2d 251 (N.D.1975), where we held that certain evidence of other acts and offenses, in a manslaughter prosecution for the death of an infant, was inadmissible. In *Stevens*, the evidence was of questionable relevancy and highly prejudicial. It was being offered to prove that the deceased infant had suffered injury. In the instant case, the evidence was highly relevant to a determination of whether or not the child was likely to suffer continued harm. Furthermore, it was not offered to prove that R. W. B. was deprived, but was rather offered to show a likelihood of continuation of an unfit home environment. As such, it is not only relevant, but highly probative.

parents. We fail to see how such statement interfered with the duty of the juvenile court. Dr. Blank, in his testimony, recommends that the child not be returned to his parents, because the medical diagnosis is consistent with Dr. Blank's conclusion that this is a case of the "battered child syndrome". Such a medical conclusion does not invade the province of the court to make its determination on the ultimate question—whether or not to terminate parental rights; therefore it was not erroneous for the trial court to overrule the objection of M. B. and B. B. to such testimony.

■ M. B. and B. B. also contend that the trial court erred in permitting the guardian ad litem to testify that she recommended termination of parental rights. In the instant case, the court appointed a non-attorney as guardian ad litem, who thereupon listened to the testimony during the hearing and subsequently recommended, based upon such testimony, that the parental rights of M. B. and B. B. to the child R. W. B. be terminated. In the case of In re A. N., supra 201 N.W.2d 118, in paragraph 2 of the syllabus, this Court held:

"2. While expert opinions are helpful, the courts are not required to accept such opinions as being conclusive."

Therefore, even if we accept the proposition that the guardian ad litem was an expert witness, the juvenile court was under no obligation to accept or rely upon her recommendation. Furthermore, even if the guardian ad litem in this case were not properly qualified to render such an opinion, we do not believe that the court committed prejudicial error in permitting such an opinion to enter the record.[2] There is nothing in the record to show that the juvenile court relied upon such opinion in its determination, and we expressly state that we do not rely upon her opinion in our

disposition of this appeal. Therefore, even if it were error to permit the guardian ad litem to testify as to her recommendation regarding termination of parental rights, we conclude that such error was harmless and should be disregarded. Rule 61, N.D.R. Civ.P.[3]

Finally, M. B. and B. B. contend that statements which they made to Irene Dybwad, an investigator for the Grand Forks County Social Service Center—before they were advised of their right to counsel and before they had obtained the services of counsel—were improperly admitted into evidence during the testimony of Mrs. Dybwad. This Court held, in the case of In re J. Z., supra 190 N.W.2d 27, in paragraph 4 of the syllabus, that:

"4. Before proceeding with an initial interview with a juvenile supervisor, parents involved in child termination proceedings are entitled to benefit of counsel."

In J. Z., supra, the parents of the child were interviewed by the juvenile supervisor about the incident which was the basis for the petition seeking termination of parental rights to the child. At such interview, the parents were not represented by counsel. This Court concluded that the juvenile supervisor, while interviewing the parents, was conducting an investigation pursuant to the authority conferred upon him by § 27–20–06, N.D.C.C., and, by gathering evidence and deciding whether or not court proceedings should be initiated, was performing functions normally performed by a law enforcement officer; consequently, the parents, at the initial interview conducted by the juvenile supervisor, were entitled to be advised of their right to counsel and to be advised that counsel would be appointed to represent them if they could not other-

---

**2.** Testimony which would "invade the province" of the trier of fact is now admissible in the federal courts, pursuant to Rule 704, Federal Rules of Evidence, which states:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

See: 3 Weinstein's Evidence ¶ 704 (Weinstein & Berger 1975).

**3.** No other issues regarding the role of the guardian ad litem are presented in this appeal for our review. However, for an excellent look at the role of the guardian ad litem, see Levine, *Guardian Ad Litem in Family Court*, 34 Maryland L.Rev. 341 (1974).

wise afford to retain counsel. § 27–20–26(1), N.D.C.C.

■ In the instant case, M. B. and B. B., were interviewed by a representative of the Grand Forks County Social Service Center, the agency initiating the petition seeking termination of their parental rights to R. W. B. The record reflects that during their initial interview with Mrs. Dybwad they were asked, among other questions, who had cared for the child and how the child's injuries were sustained. Such questions, like the situation presented in *J. Z., supra*, are questions designed to elicit evidence of child abuse. We conclude that, based upon the decision of this Court in *J. Z., supra*, M. B. and B. B. in the instant case were entitled to be advised of their right to counsel pursuant to § 27–20–26(1), N.D.C.C., because the investigation being conducted by Mrs. Dybwad had focused upon them. We express no opinion, however, on the necessity for advising a parent of the right to counsel where the investigation involves only the initial screening of the complaint (such as where investigators visit the parent's home based upon an anonymous complaint) or an initial determination of whether sufficient evidence exists to substantiate such complaint. See *In re J. Z., supra* 190 N.W.2d at 32.

■ Having concluded that M. B. and B. B. were entitled, by statute, to counsel at the initial interview with Mrs. Dybwad, we must next determine whether the failure to so advise them was prejudicial in this case. We have examined the record and conclude that it was not prejudicial error to permit Mrs. Dybwad to testify about the conversation she had had with M. B. and B. B.

Mrs. Dybwad's testimony, as it pertained to information secured during the initial interview, showed that neither parent knew how the injuries to R. W. B. had occurred; and also showed that both parents were the only persons who had cared for R. W. B. since his birth. The very same information was elicited from M. B. and B. B. while they were testifying in their own behalf, as well as from the testimony of their own expert witness, Dr. Maxine Rasmussen, a therapist associated with the Northeast Region Mental Health Center. We therefore fail to see how M. B. and B. B. were prejudiced by the testimony of Mrs. Dybwad about their admissions during the initial interview. Even if we were applying the stricter constitutional standard to a criminal case—which we are not—we would conclude that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967); *State v. Stevens*, 238 N.W.2d 251 (N.D.1975); *State v. Hilling*, 219 N.W.2d 164 (N.D.1974); *State v. Ghylin*, 222 N.W.2d 864 (N.D.1974).

■ Having concluded that all of the contested evidence, with the one exception discussed in the above paragraph, was properly admitted, we must next determine whether or not the evidence sustains the conclusion that the deprivation is likely to continue or will not be remedied, and that the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm thereby.

On this issue, M. B. and B. B. basically contend that they were not given psychological treatment by the agencies involved; nor were they given adequate time to attempt to remedy the deficiencies in their mental status which have, in the past, resulted in their inappropriate responses to stress and frustration.

We have carefully reviewed, in detail, the psychological and psychiatric evidence presented to the court, and conclude therefrom that although both parents profess to be interested in psychiatric treatment for as long as necessary to solve their problem, there is no evidence that treatment can be successfully undertaken in a time frame which would permit R. W. B. to return to his parental home without causing a severe dislocation from the emotional attachments that R. W. B. may form during long-term foster care. All of the expert witnesses agreed that the mother, B. B., would have to undergo treatment for at least an additional year. There were no estimates of the length of time that the father, M. B., would be required to undergo therapy. Further-

more, the evidence is overwhelming that these two parents are not capable of reacting in an appropriate manner to the stresses and frustrations of child-rearing. In this case, we have parents who have inflicted severe physical abuse on two children; the second incident occurring after their parental rights to their first child were terminated by another court.

The factual setting of this case is not the same as the factual settings presented to this Court in the cases of *In Interest of M. L., supra,* and *In re J. V., supra.* In those cases, the respective parents exhibited good judgment in seeking to provide proper care for their children. In both cases, the mothers sought assistance to avoid the possibility of injuring their children. In each case, the respective mother fully recognized that she was failing in her duty to provide proper child care. In the case of *In Interest of M. L., supra,* the psychiatric evidence clearly showed that long-term treatment was not necessary, and that substantial progress had been made in less than nine months.

In contrast, the evidence in the instant case shows that if psychiatric treatment is to be successful, it will of necessity require long-term psychiatric care; that favorable prognosis cannot with any assurance be given at this time; that the parents were responsible for the severe physical abuse of two infant children who were less than one year old at the time that the separate incidents occurred; and that the parents do not yet recognize the seriousness of their actions. Consequently, even if treatment were to be provided and if the parties fully participated therein, it is clear that such treatment would have to extend far beyond the time in which it would be probable that R. W. B. could be successfully assimilated into an improved family environment. *In re H., supra,* 206 N.W.2d at 875. The prognosis for the parents' future ability to provide proper care for R. W. B., based upon the past history of M. B. and B. B., and upon the psychiatric evidence, is not favorable. Based upon such evidence, we conclude that it is likely that the conditions of deprivation will extend into the future and that it is unlikely that the conditions will be remedied.

Based upon the record, we also conclude that the child, R. W. B., is suffering serious physical, mental, moral, and emotional harm because of the physical abuse which has been previously described, and in view of the poor prognosis for any significant improvement in conditions in the foreseeable future, we believe that he would probably suffer such harm if he remained in the care, custody, or control of his parents.

The order of the juvenile court is therefore affirmed.

ERICKSTAD, C. J., and PEDERSON, VOGEL and SAND, JJ., concur.

