**In the Interest of D. S., a child.**

**Jonathan T. GARAAS, Petitioner and Appellee,**

**v.**

**D. S., T. S., and D. S., Respondents and Appellants.**

**Civ. No. 9383.**

Supreme Court of North Dakota.

Feb. 16, 1978.

As Corrected March 2, 1978.

Rehearing Denied March 15, 1978.

Marvin D. Nordeng, State's Atty., and Jonathan T. Garaas, Asst. State's Atty., Fargo, for State of North Dakota; argued by Jonathan T. Garaas.

Frederick D. Kraemer, Fargo, for respondent and appellant, D.S., a minor.

PAULSON, Judge.

This is an appeal by a juvenile [hereinafter D.S.] from the order of adjudication

entered on June 3, 1977, by the Cass County Juvenile Court, finding D.S. guilty of the delinquent act of murder.[1] The juvenile court committed D.S. to the State Industrial School for a period of two years. Prior to the hearing on the delinquency charge, D.S. filed a motion to suppress the use of his confession, and the fruits obtained thereby, as evidence at the delinquency hearing. The motion to suppress was denied. D.S. asserts, on this appeal, that the juvenile court committed error when it denied the motion to suppress this evidence which resulted in prejudice to D.S. upon its admission at the delinquency hearing.

This Court's scope of review under the Uniform Juvenile Court Act, pursuant to § 27–20–56 of the North Dakota Century Code, is equivalent to the former procedure of trial de novo. *McGurren v. S. T.,* 241 N.W.2d 690 (N.D.1976). This Court will independently review the evidence presented to the juvenile court at the hearing on the motion to suppress. *In re K. B.,* 244 N.W.2d 297 (N.D.1976). Although the juvenile court's findings of fact are entitled to appreciable weight, this Court is not bound by those findings. *In re R. W. B.,* 241 N.W.2d 546 (N.D.1976).

On May 4, 1977, D.S. was taken into custody by the Fargo police, at the request of his parents, and placed in the Cass County Juvenile Detention Center. A petition was filed charging D.S. with the delinquent act of criminal mischief for causing damage to the walls of his home. An informal detention hearing was held on May 5, 1977, and the hearing referee, Arthur H. Lieb, for the Cass County Juvenile Court, ordered that D.S. continue to be detained at the Juvenile Detention Center pending a final determination on the criminal mischief charge. On the morning of May 6, 1977, between 10 a. m. and 11 a. m., Frank A. Boardman, a counselor at the detention center for Cass County, approached D.S. and asked him whether he had an attorney. D.S. responded with a question as to how he could get an attorney. Boardman immedi-

ately placed a phone call to Julie Ann Korst, the juvenile court receptionist who is in charge of making arrangements to obtain attorneys for juveniles. Boardman informed Korst that D.S. wanted an attorney, and Korst then explained to Boardman the procedure for obtaining one. Boardman testified as follows:

"Q. Did you then go back and explain all this to [D.S.]?

"A. There wasn't much to explain since I am not too familiar with the process. I did tell [D.S.] that if his parents are financially well off that the Court would probably not pay for the attorney. His statement was—his statement was something like—see if you can get me a Court appointed attorney. I don't want my parents to pay for my attorney.

"Q. He did tell you to get an attorney?

"A. A Court appointed attorney."

At this point it is necessary to digress, in our statement of the facts, to the investigation of the disappearance, on December 10, 1976, of Debra Dahl. During the morning of May 5, 1977, a body was found, floating in a culvert in South Fargo, which was identified later that day as the body of Debra Dahl. On that same date, May 5, Michael Lyman, Cass County Deputy Sheriff, was placed in charge of investigating Debra Dahl's death and Dale Remus, Special Agent for the North Dakota Bureau of Criminal Investigation, was requested to aid in the investigation. Deputy Lyman testified, in part, as follows:

"Q. Had someone mentioned to you that [D.S.] was a possible suspect that you should talk with?

"A. I had read all the Fargo Police Reports and they were current from the time Debra Dahl disappeared, and those Police reports mentioned [D.S.'s] name several times.

"Q. So, you felt he was a likely suspect?

"A. From reading the reports, he was the number one suspect, yes."

---

1. The Notice of Appeal inadvertently refers to the "judgment and conviction", whereas the instrument signed by the district judge is entitled "Order".

Lyman and Remus decided to interrogate D.S. on May 6, 1977. Prior to speaking with D.S., Lyman and Remus attempted unsuccessfully to contact his parents. At the time of the interrogation, Lyman and Remus were unaware of D.S.'s request to Boardman earlier that morning for an appointed attorney.

At approximately 1:30 p. m., Lyman and Remus took D.S. from his room at the juvenile detention center to a Cass County sheriff's office conference room located on a lower level in the same building as the juvenile detention center. D.S. was informed by Lyman and Remus that they wanted to talk with him concerning their investigation of Debra Dahl's death. D.S. was then advised of his *Miranda* rights and was told that he could have his parents present. Lyman testified:

"A. He was advised of his rights verbally. He signed a waiver of his rights in my presence and that of Special Agent Dale Remus, and he was advised that his parents could be present. I believe I did that. And [D.S.] told us that he didn't wish to have an attorney at that time. Made no mention of having an attorney and he didn't wish his parents to be present."

D.S. confessed, after approximately fifteen or twenty minutes of interrogation, that he had shot and killed Debra Dahl with a .22 caliber rifle. Upon termination of the interrogation, a state's attorney's inquiry was immediately held, wherein D.S. again repeated his confession, which was recorded by a court reporter. At the close of the state's attorney's inquiry, D.S. offered to go to the home of his parents with Lyman and Remus to get the .22 caliber rifle which had been used in the commission of the crime.

At 4:37 p. m., Lyman and Remus obtained a search warrant to seize a .22 caliber rifle and ammunition from D.S.'s home. With regard to securing this evidence, Lyman testified as follows:

"Q. What were you seeking to get from [D.S.'s parents'] home when you went over there with a search warrant?

"A. The—the Affidavit was made out for, I believe a .22 Browning lever action rifle and .22 ammunition.

"Q. Where did you find out about this rifle and ammunition?

"A. From [D.S.].

"Q. At what time?

"A. During the—during the interview. I could refer to the report. I think I have it logged pretty close.

"Q. Well, just generally, you found, you didn't know anything about that gun?

"A. Around 2:00 p. m.

"Q. And prior to that time you didn't know anything about that gun?

"A. No.

"Q. And you didn't know anything about the ammunition?

"A. No.

"Q. Your knowledge of where those items were and their possible use in the Debra Dahl death came out of the statement to you, or statements given to you, by [D.S.]?

"A. That's correct."

At approximately 6:15 p. m., on the evening of May 6, 1977, D.S.'s father called the juvenile detention center and spoke with Stephen Dawson, a counselor for the juvenile detention center. Dawson informed D.S.'s father that it would be permissible for him to visit D.S. that evening. After this phone conversation, Dawson spoke with D.S. Dawson testified at the hearing, as follows:

"A. I went into the room to talk with him. I told him that I had read testimony in the log earlier that he had asked about a lawyer. And I reminded him that he had a right to legal counsel and asked him if he wanted a lawyer.

"Q. What did [D.S.] tell you at that time?

"A. He said he did not need an attorney. The only reason he was there was because he had a fight at home.

"Q. What did you say to [D.S.] upon hearing that?

"A. Well, I was a little surprised. I again reminded him that he could have a lawyer if he wanted one. And that I had spoken with his dad briefly about this. [D.S.] then expressed concern about he did not want his parents to pay for a lawyer and he commented that he did, finally, took some money from my dad. I have informed him that if his parents could not afford a lawyer the State would provide one. He should not be concerned with the cost of a lawyer or who ended up paying for it. That his only concern would be whether or not he wants a lawyer.

"Q. What happened after that, Mr. Dawson?

"A. I told him that I encouraged him to speak with his parents about it and said they would be in soon. The conversation was over. His closing comment, okay, I suppose I will take one if I don't have to pay for it."

At approximately 6:45 p. m., D.S.'s parents visited him at the detention center. Upon the completion of their visit, D.S.'s parents left the detention center, and within four or five minutes D.S. requested Dawson to obtain an attorney for him.

D.S. was fifteen years of age at the time of Debra Dahl's death and he was sixteen years of age at the time of his interrogation by Lyman and Remus.

A petition was filed in juvenile court charging D.S. with the delinquent act of murder. Prior to the hearing on this charge, D.S. moved to suppress the use of his confession, and the fruits thereof, as evidence at the delinquency hearing. The motion was denied and the confession, as well as the .22 caliber rifle and ammunition which had been seized from D.S.'s home, were subsequently admitted into evidence at the delinquency hearing. The juvenile court entered judgment finding D.S. guilty of the delinquent act of murder, and D.S. now appeals from that judgment.

D.S. asserted on his motion to suppress and again asserts on this appeal that his confession, and the fruits thereof, were obtained in violation of his right to counsel pursuant to § 27–20–26, N.D.C.C., and also in violation of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

D.S. asserts that his confession was obtained in the course of violation of his right to counsel under subsection 1 of § 27–20–26, N.D.C.C., which provides as follows:

"27–20–26. Right to counsel.—

"1. Except as otherwise provided under this chapter, a party is entitled to representation by legal counsel at all stages of any proceedings under this chapter and, if as a needy person he is unable to employ counsel, to have the court provide counsel for him. If a party appears without counsel the court shall ascertain whether he knows of his right thereto and to be provided with counsel by the court if he is a needy person. The court may continue the proceeding to enable a party to obtain counsel and shall provide counsel for an unrepresented needy person upon his request. *Counsel must be provided for a child not represented by his parent, guardian, or custodian.* If the interests of two or more parties conflict separate counsel shall be provided for each of them." [Emphasis added.]

The statutory right to counsel provided under § 27–20–26, N.D.C.C., pertains to "all stages of any proceedings" under the Uniform Juvenile Court Act. Prior case decisions of this Court have dealt with instances in which the right to counsel under § 27–20–26, N.D.C.C., was held to be applicable. *State v. Grenz,* 243 N.W.2d 375 (N.D.1976); *In re R. W. B.,* 241 N.W.2d 546 (N.D.1976); *In re J. Z.,* 190 N.W.2d 27 (N.D.1971).

The case of *In re J. Z., supra,* involved parental termination proceedings under the Uniform Juvenile Court Act. This Court

determined that the initial interview of the parents by a juvenile supervisor was a stage of the proceedings which entitled the parents to be advised of their right to counsel under § 27–20–26, N.D.C.C. At the time of the interview, the juvenile supervisor was functioning as a law enforcement officer gathering evidence on the one hand, and, on the other, determining whether there would be court proceedings to terminate parental rights.

The case of *In re R. W. B., supra,* also involved the termination of parental rights. This Court, in a unanimous decision, reaffirmed *In re J. Z., supra,* and concluded that the parents were entitled to be advised of their right to counsel pursuant to § 27–20–26, N.D.C.C., prior to their interview by a social service representative where the investigation being conducted had "focused" upon the parents.

■ In the instant case, the interrogation of D.S. by Deputy Sheriff Lyman and Special Agent Remus regarding Debra Dahl's death occurred while D.S. was being held in custody at the detention center on a criminal mischief charge. At the time of the interrogation, D.S. was also the "number one suspect" in the Debra Dahl investigation. Based upon the decisions of this Court in *In re J. Z.* and in *In re R. W. B., supra,* we conclude that the custodial interrogation of a juvenile in which the investigation has focused upon the juvenile, is a stage of the proceedings for the purpose of invoking the juvenile's statutory right to counsel provided under § 27–20–26, N.D.C.C. Accordingly, D.S.'s rights under that section were fully applicable at the time of his interrogation by Lyman and Remus. D.S. asserts that these rights were violated. We agree.

Section 27–20–26, N.D.C.C., unambiguously states that "Counsel must be provided for a child not represented by his parent, guardian, or custodian.". The record reveals that D.S. did not have a guardian or custodian, and that D.S.'s parents were not contacted prior to his interrogation. In view of the fact that D.S.'s parents were neither contacted nor present at the interrogation, it cannot be persuasively argued that D.S. was "represented by his parent" at the interrogation. On the contrary, D.S.'s parents had interests adverse to those of D.S. on the pending criminal mischief charge. In fact, D.S. was initially placed in custody at the juvenile detention center by the Fargo police *at the request of his parents.* The record is clear that, at the time of the interrogation, D.S. was not represented by his parent, guardian, or custodian, and, therefore, § 27–20–26, N.D.C.C., required that "counsel must be provided" for him. The ultimate question is whether this statutory right to counsel can be waived and, if so, whether D.S. did, in fact, waive this right.

■ Certain constitutional rights, including the Sixth Amendment right to counsel and the Fifth Amendment right against compelled self-incrimination are capable of being waived. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Nevertheless, the State Legislature, by statutory enactment, can provide greater relief or protection to the people than is granted by the State or Federal Constitution. *See, State v. Carmody,* 243 N.W.2d 348 (N.D.1976).

■ Words used in a statute are to be interpreted according to their plain, ordinary, and commonly understood meaning. § 1–02–02, N.D.C.C.; *Richard v. Johnson,* 234 N.W.2d 22 (N.D.1975). Section 27–20–26, N.D.C.C., provides that counsel "must" be provided for a child not represented by his parent, guardian, or custodian. The ordinary meaning of the word "must" is to impose a duty or grant a right which is *mandatory* or *imperative.* The word "must" cannot be construed to impose or grant a merely directory or nonmandatory duty or right unless the context within which it is used clearly indicates that such was the intent of the Legislature. *See, Borough of Tenafly v. Centex Homes Corporation,* 139 N.J.Super. 490, 354 A.2d 382 (Super.Ct.Law Div.1975); *Arkansas State Highway Commission v. Mabry,* 229 Ark. 261, 315 S.W.2d 900 (1958); *Consolidated*

*Chemical Laboratories v. Cass County,* 141 Neb. 486, 3 N.W.2d 920 (1942); *Lindskog v. Equitable Life Assur. Soc. of United States,* 209 Minn. 13, 295 N.W. 70 (1940). Within the context of § 27–20–26 N.D.C.C., it is clear that the word "must" was meant to impose a mandatory duty to appoint counsel for a child not represented by his parent, guardian, or custodian.

 It is a well-settled rule of statutory construction that a statute must be construed as a whole with the view of arriving at the intent of the Legislature. *Horst v. Guy,* 219 N.W.2d 153 (N.D.1974). Effect must be given, if possible, to every word, clause, and sentence of the statute. *Grabow v. Bergeth,* 59 N.D. 214, 229 N.W. 282 (1930).

The first three sentences of subsection 1 of § 27–20–26, N.D.C.C., provide that at all stages of the proceedings, under the Uniform Juvenile Court Act, a party is entitled to counsel; that the court shall ascertain if the party knows of his right to counsel; and that the court shall provide counsel for an unrepresented needy person upon his request. The fourth sentence then provides that counsel must be furnished to a child not represented by his parent, guardian, or custodian. In view of the rights provided by the first three sentences of this section, the fourth sentence will have meaning and effect only if it is interpreted as mandating a nonwaivable right to counsel for such a child. Any other interpretation would render the fourth sentence of subsection 1 of § 27–20–26, N.D.C.C., meaningless, excess verbiage, in view of the rights provided by the first three sentences of this subsection. Within the context of subsection 1 of § 27–20–26, N.D.C.C., the fourth sentence is clear and unambiguous. A child who is not represented by his parent, guardian, or custodian must be provided with counsel to assist him and to protect his interests. In the case of *State v. Grenz,* 243 N.W.2d 375 (N.D.1976), Justice Vogel, writing for a

unanimous Court, made the following statement, at page 380:

"By adopting the Uniform Juvenile Court Act provision entitling a juvenile to representation by legal counsel at all stages of the proceedings, it is apparent that the Legislature recognized the necessity for an advocate on behalf of the child to be present to protect the interests of the child in the often-adversary setting of juvenile court proceedings."

 We emphasize, for purposes of clarity, that in a case where the child's parent, guardian, or custodian is with the child and acting in a representative capacity on the child's behalf, § 27–20–26, N.D.C.C., operates to impose a different mandate. In such a situation, § 27–20–26, N.D.C.C., requires that the child and his parent, guardian, or custodian be informed of the child's right to counsel and to have counsel provided by the court if his parent or parents cannot, without undue financial hardship, provide full payment for legal counsel and other expenses of representation. However, in the situation where the child is represented by his parent, guardian, or custodian, § 27–20–26, N.D.C.C., does not preclude the possibility of a waiver, by the child, of his right to counsel providing the waiver is knowingly, intelligently, and voluntarily made.

 We conclude, upon a careful examination of § 27–20–26, N.D.C.C., that this section imposes a mandatory duty to provide counsel for a child at all stages of the proceedings under the Uniform Juvenile Court Act providing the child is not represented by his parent, guardian, or custodian.[2] Furthermore, we conclude that this right to counsel cannot be waived by a child who is not represented by his parent, guardian, or custodian. *See, K. E. S. v. State,* 134 Ga.App. 843, 216 S.E.2d 670 (1975). Any other interpretation would be

---

**2.** It should be noted that under subsection 2 of § 27–20–26, N.D.C.C., any parent entitled to the custody of a child involved in a proceeding under the Uniform Juvenile Court Act is responsible for providing legal counsel for the child unless undue financial hardship would ensue. The court is authorized under this subsection to enforce performance of this duty by appropriate order.

contrary to the clear and unambiguous language of § 27–20–26, N.D.C.C.[3]

■ Accordingly, we hold that D.S. was denied his right to counsel under § 27–20–26, N.D.C.C., at the time of his custodial interrogation by Lyman and Remus. The consequence of this violation is set forth under subsection 2 of § 27–20–27, N.D.C.C., which provides:

"*27–20–27. Other basic rights.—*

. . . . .

"2. A child charged with a delinquent act need not be a witness against or otherwise incriminate himself. An extra-judicial statement, if obtained in the course of violation of this chapter or which would be constitutionally inadmissible in a criminal proceeding, shall not be used against him. Evidence illegally seized or obtained shall not be received over objection to establish the allegations made against him. A confession validly made by a child out of court is insufficient to support an adjudication of delinquency unless it is corroborated in whole or in part by other evidence."

D.S.'s confession was consequently inadmissible as evidence against him at the delinquency hearing in the juvenile court.

■ D.S. further asserts that the .22 caliber rifle and ammunition which were seized from D.S.'s home should also have been suppressed as "fruit" of the unlawfully obtained confession. The "fruit of the poisonous tree" doctrine acts to exclude evidence which is obtained as a consequence of an unlawful official action. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The test of whether the particular evidence is inadmissible "fruit" is to determine whether the evidence was obtained as a consequence of or by exploitation of the unlawful action rather than from an independent source signifi-

cant to purge the primary taint. *Wong Sun, supra; Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). This doctrine was established as a natural extension of the exclusionary rule to redress violations of constitutional rights. In the instant case, however, we have determined that the violation was of the *statutory* right to counsel under § 27–20–26, N.D. C.C. Subsection 2 of § 27–20–27, N.D.C.C., expressly excludes the use of a child's extrajudicial statement which is obtained in violation of the Uniform Juvenile Court Act. This subsection also excludes, upon proper objection, "Evidence illegally seized or obtained". We conclude that the language of subsection 2 of § 27–20–27, N.D. C.C., is sufficiently broad to encompass the "fruit of the poisonous tree" doctrine, whereby evidence obtained in the course of violation of the Uniform Juvenile Court Act is inadmissible as evidence against a child charged with a delinquent act.

The record clearly reveals, through Deputy Sheriff Lyman's testimony, that the .22 caliber rifle and ammunition were seized at D.S.'s home as a direct result of the knowledge obtained from D.S.'s confession. These items of evidence are "fruits" of the unlawfully obtained confession, and they are therefore inadmissible as evidence against D.S.

Accordingly, we hold that the juvenile court committed prejudicial error when it denied D.S.'s motion to suppress the use of D.S.'s confession, as well as the .22 caliber rifle and ammunition seized at D.S.'s home, as evidence at the juvenile delinquency hearing. The order of adjudication is, therefore, reversed and the case is remanded for a new trial.

Because we have determined that the items of evidence which D.S. moved to suppress must be suppressed on the ground of violation of D.S.'s rights under § 27–20–26, N.D.C.C., and also that the order of ad-

---

**3.** When the wording of a statute is clear and free of all ambiguity, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit. This Court cannot invade the province of the Legislature when the Legisla-

ture has so clearly spoken. Any change in the mandates of this statutory provision must be secured from the Legislature, in which such authority is vested by the State Constitution. *McKee v. Kinev,* 160 N.W.2d 97 (N.D.1968).

judication must be reversed and remanded on that ground, it is neither necessary nor provident to discuss the constitutional and other issues raised by D.S. on appeal.

ERICKSTAD, C. J., and VOGEL and SAND, JJ., concur.

PEDERSON, Justice, concurring specially.

I reluctantly concur in the result reached by the majority and in the reasoning of the majority. I do not, however, see the need to construe § 27–20–26, NDCC, when there is a precedent that the Legislature has directed us to follow.

Section 27–20–26, NDCC, is part of the Uniform Juvenile Court Act which was adopted by the 1969 North Dakota Legislature. The Uniform Juvenile Court Act has been adopted in one other jurisdiction, Georgia, where § 27–20–26 is duplicated in Georgia Code Annotated, § 24A–2001. Georgia adopted the Uniform Juvenile Court Act in 1971.

A rule of construction peculiar to uniform statutes is found in § 1–02–13, NDCC:

"1–02–13. Uniform laws interpreted to effect purpose.—Any provision in this code which is a part of a uniform statute shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it."

This statute imposes upon this Court the duty of looking to Georgia courts to determine if those courts have interpreted or construed Georgia Code Annotated § 24A–2001. I conclude that they have.

The Georgia courts have discussed the juvenile's right to counsel many times. They have directly construed § 24A–2001 on four occasions. See *Sanchez v. Walker Cty. Dept. of F. & C. Serv.,* 237 Ga. 406, 229 S.E.2d 66 (1976); *K. E. S. v. State,* 134 Ga.App. 843, 216 S.E.2d 670 (1975); *A. C. G. v. State,* 131 Ga.App. 156, 205 S.E.2d 435 (1974); *T. K. v. State,* 126 Ga.App. 269, 190 S.E.2d 588 (1972). *K. E. S., supra,* in particular, controls the case before this Court.

K.E.S. was a fifteen-year-old girl who appeared in juvenile court as an unruly child. Her mother had made reports to juvenile authorities which resulted in K.E.S.'s appearance before the court. She appeared, accompanied by her mother. At the appearance, she and her mother separately signed written waivers indicating that they did not wish to be represented by counsel. The State argued that this constituted a complete and sufficient waiver of K.E.S.'s right to counsel. The court stated as follows:

"There is no transcript of the proceedings and testimony by which we can determine on this review that the accused understood the meaning of her 'waiver.' Be that as it may, 'the right to counsel may be waived . . ., *unless the child is "not represented by his parent,* guardian, or custodian."' . . . [Cite omitted.] 'Counsel *must* be provided for a child not represented by his parent . . .' Code Ann. § 24A–2001. . . . Certainly here there was no competent representation of this girl by her mother, and the young girl's waiver was therefore ineffective." [All emphasis in original.] 216 S.E.2d at 673.

The case of *K. E. S., supra,* is complemented by *H. L. B. v. State,* 135 Ga.App. 474, 218 S.E.2d 150, 151 (1975), wherein the court held:

"The evidence is sufficient, if believed, to show that the officer taking the confession amply advised the juvenile *and his sister-custodian* what his legal rights were and particularly as to the right to be represented by counsel prior to making any statement or answering any questions, . . . The evidence was sufficient to show that the waiver signed by the juvenile and his sister-custodian was freely and voluntarily given prior to the time of questioning and taking the confession."

In *M. K. H. v. State,* 135 Ga.App. 565, 218 S.E.2d 284, 287 (1975), the court reversed a finding of delinquency of a fifteen-year-old boy who had confessed to vandalism and

arson after being given his *Miranda* rights. The court stated:

" . . . the record does not reveal that any effort was made by the arresting officers to determine if the child *understood* what was being said when the '*Miranda* rights' card was read to him." [Emphasis in original.]

In that case Presiding Judge Deen authored a dissent in which he stated that, while he was in sympathy with the majority view, he had difficulty applying it in this case where extensive efforts on the part of the police to locate the parents had failed. He said:

"I am not willing to say that no effort may ever be made to question a child, where his parents are unavailable, until an attorney is present, because I do not believe this is the rule enunciated by *In re Gault*, [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)], nor do I think it is in the interest of either the child or society." *M. K. H. v. State*, 218 S.E.2d at 289.

In *J. J. v. State*, 135 Ga.App. 660, 218 S.E.2d 668, 671 (1975), the court stated:

"It was therefore error to admit over objections the incriminating statements made in jail by the juvenile in the absence of his parents and where the police officers had proceeded to quiz the juvenile before compliance with the statutory prerequisites." [Cites omitted.]

I join in the concern of Presiding Judge Deen as expressed in his dissent in *M. K. H.,* *supra.* Though I believe, with the majority, that the Legislature has mandated this result, I cannot agree that it is either wise or in the best interests of society.